[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 6, 2002
THOMAS K. KAHN
CLERK

No. 01-11915

D. C. Docket No. 96-00084-CV-(WLS)-6

CARL J. ISAACS,

Petitioner-Appellant,

versus

FREDERICK J. HEAD, Warden,
Georgia Diagnostic and
Classification Prison,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Georgia

_____

**(August 6, 2002)**

Before EDMONDSON, Chief Judge, ANDERSON and BARKETT, Circuit
Judges.

ANDERSON, Circuit Judge:

In 1985, this Court granted a writ of habeas corpus based on constitutional infirmities with Carl Isaacs' 1974 state murder trial. See Isaacs v. Kemp, 778 F.2d 1482 (11th Cir. 1985). Afterwards, the State of Georgia retried Isaacs in 1988 on six counts of murder, and Isaacs was again convicted and sentenced to death. Isaacs was denied relief from his conviction and sentence through direct appellate review and through state collateral review, and the case has now made its way to the federal courts again. After Isaacs filed his federal habeas petition, pursuant to 28 U.S.C. § 2254, the district court denied Isaacs any relief, but granted him a certificate of appealability as to numerous issues. Isaacs then filed this appeal contending that his second trial and sentencing hearing did not satisfy minimal constitutional guarantees. We disagree, and affirm the district court's denial of habeas relief.

I. BACKGROUND

A. Facts

The historical facts concerning Isaacs' case, as concisely recounted by the Georgia Supreme Court, are as follows:

> In May of 1973, Carl Isaacs escaped from a Maryland penal
> institution and, accompanied by his younger brother Billy Isaacs, his

2

half- brother Wayne Coleman and a friend, George Dungee, drove to Florida. On the afternoon of May 14, 1973, they were in Seminole County, Georgia, and their car was almost out of gas. They thought they saw a gas pump behind the rural mobile home belonging to Jerry Alday and Mary Alday and stopped to investigate it. They discovered there was no pump; however, the trailer was empty, and they decided to burglarize it. Dungee remained in the car while the defendant and Wayne Coleman entered the trailer. While they were inside, Billy Isaacs warned them two men were approaching in a jeep.

Jerry Alday and his father Ned Alday pulled in behind the trailer, unaware that it was being burglarized. Carl Isaacs met them and ordered them inside at gunpoint. After their pockets were emptied, Jerry Alday was taken into the south bedroom of the trailer while Ned was taken to the north bedroom. Carl Isaacs shot and killed Jerry Alday, and then both he and Coleman shot and killed Ned Alday.

Soon afterward, Jimmy Alday (Jerry Alday's brother) drove up on a tractor, walked to the back door, and knocked on the door. Coleman answered the door, "stuck a pistol up in the guy's face," and ordered him inside. He was taken into the living room and forced to lie on the sofa. Carl Isaacs shot and killed him.

After Carl Isaacs went outside to move the tractor, which was parked in front of their car, Mary Alday (Jerry Alday's wife) drove up. Carl Isaacs entered the trailer behind her and accosted her. Meanwhile, Chester Alday (Jerry Alday's brother) and Aubrey Alday (Jerry Alday's uncle) drove up in a pickup truck. Leaving Coleman and Dungee to watch Mary Alday, Carl and Billy Isaacs went outside to confront the two men, and forced them at gunpoint into the trailer. Once inside, Aubrey was taken to the south bedroom where Carl Isaacs shot and killed him, while Chester Alday was taken to the north bedroom and killed by Coleman.

Coleman and Carl Isaacs raped Mary Alday on her kitchen table. Afterward, they drove to a heavily wooded area several miles away where Mary Alday was raped again. Dungee killed her. They abandoned their car in the woods and took Mary Alday's car, which

they later abandoned in Alabama. They stole another car there, and were arrested a few days later in West Virginia, in possession of guns later identified as the murder weapons, and property belonging to the victims.

After his original trial, Carl Isaacs was interviewed by a film maker who was producing a documentary about the case. The defendant admitted shooting Jerry, Ned, Aubrey and Jimmy Alday, raping Mary Alday, and burglarizing the trailer. These admissions were introduced in evidence at the retrial.

Isaacs v. State, 259 Ga. 717, 718-19, 386 S.E.2d 316, 320 (1989). Neither party disputes these facts.

B.  Procedural History

After we granted Isaacs a writ of habeas corpus following his first conviction, Isaacs was retried in Houston County, Georgia in 1988, and was again convicted of six counts of murder and sentenced to death.   On appeal, the Georgia Supreme Court affirmed the conviction and sentence, Isaacs v. State, 259 Ga. 717, 386 S.E.2d 316 (1989), and the U.S. Supreme Court denied certiorari.  Isaacs v. Georgia, 497 U.S. 1032, reh'g denied, 497 U.S. 1051 (1990).  In 1991, Isaacs filed a petition seeking state habeas corpus relief, and the Butts County Superior Court conducted an evidentiary hearing on the petition in 1993.  The state court denied Isaacs' petition, and the Georgia Supreme Court denied Isaacs' petition for a certificate of probable cause.  See Isaacs v. Thomas, No. S95H0164 (Ga. April 14,

4

1995).  The U.S. Supreme Court again denied cert.  Isaacs v. Thomas, 516 U.S. 1002, reh'g denied, 516 U.S. 1099 (1996).

While the rehearing motion was pending in the U.S. Supreme Court, Isaacs filed a motion with the federal district court in the Middle District of Georgia for appointment of habeas counsel pursuant to 21 U.S.C. § 848(q)(4)(B).  The district court granted the motion on February 9, 1996.   On November 4, 1996, the district court ordered that Isaacs' §2254 petition be filed by December 6, 1996, and Isaacs filed it on that day.

Between the time that the district court granted Isaacs' motion for appointment of habeas counsel and the time that Isaacs actually filed his §2254 petition, Congress passed the Anti-terrorism and Effective Death Penalty Act of 1996 (AEDPA), 110 Stat. 1214, which took effect on April 24, 1996.  Therefore the timing of Isaacs' various filings gave rise to one of the issues before the district court and involved in this appeal – whether the more lenient pre-AEDPA standards, or the stricter AEDPA standards, should be applied to Isaacs' petition. After briefing by the parties, the district court ruled that it would apply AEDPA to Isaacs' petition.

In February 1999, the district court directed the parties to file briefs on procedural default and on discovery.  The court then entered an order ruling on the

claims of procedural default, denying discovery, and directing briefing on "all grounds raised."

On August 25, 2000, the district court entered an order denying Isaacs' request to present evidence as to certain grounds and denying relief based on the merits of all of the claims not previously found to be procedurally barred. After the district court also denied a motion for reconsideration, Isaacs filed a timely notice of appeal on April 5, 2001. On May 2, 2001, the district court issued a certificate of appealability, pursuant to 28 U.S.C. § 2253(c), giving Isaacs the right to appeal 16 different issues (all of the ones with respect to which Isaacs requested permission to appeal).

## II. ISSUES PRESENTED

Of the issues for which Isaacs received permission to appeal, he apparently chose to abandon all but eight for purposes of this appeal. Therefore, the only issues before this Court are:

A.      Whether the district court correctly determined that AEDPA applied to Isaacs' § 2254 habeas petition.

B.      Several issues related to the prayer given at the beginning of Isaacs' trial, including:

1. Whether Isaacs' constitutional rights were violated when his trial was opened with a prayer.

2. Whether the district court erred by denying discovery or the presentation of evidence during the federal habeas proceedings concerning the prayer that opened Isaacs' trial.

3. Whether Isaacs' constitutional claims regarding the failure to record the prayer which opened his trial were properly dismissed as procedurally defaulted.

4. Whether the district court correctly determined that Isaacs' ineffective assistance of counsel claim based on his counsel's failure to recreate the record of the prayer which opened Isaacs' trial was procedurally defaulted.

C. Whether the admission of statements made by Isaacs while in custody concerning two escape attempts violated his constitutional rights.

D. Whether Isaacs' constitutional rights were violated by the presentation of evidence, argument and jury instructions concerning his lack of remorse.

E. Whether the district court correctly determined that Isaacs' challenge to electrocution as cruel and unusual punishment was procedurally defaulted.

III. DISCUSSION

A. Applicability of AEDPA to Isaacs' Petition

The first issue that we will address – whether AEDPA is applicable to Isaacs' §2254 petition – affects our review of all of Isaacs' claims. The relevant facts, as mentioned above, are that Isaacs filed a motion for appointment of habeas counsel, and the district court granted that motion, prior to the effective date of AEDPA. However, Isaacs did not file his actual habeas petition until after the effective date. The Supreme Court subsequently held that the new AEDPA standards did not apply to pending cases. See Lindh v. Murphy, 521 U.S. 320, 117 S. Ct. 2059 (1997). So, the critical issue becomes whether Isaacs' habeas case was pending, for purposes of AEDPA's applicability, from the time that Isaacs moved for appointment of counsel, or only from the later time when he filed his habeas petition. As a matter of first impression in this Court, we agree with the district court, and the majority of the other circuits which have addressed this narrow issue,[1] and hold that Isaacs' habeas case was pending only from the time that he

_____

[1] So far five other circuits have addressed the precise issue that is presented to us. Of those, the Ninth Circuit is the only one to agree with Isaacs' position that AEDPA should not apply to habeas cases in which the petitioner had moved for appointment of counsel prior to AEDPA's effective date, even though the actual petition was filed subsequent thereto. See Garceau v. Woodford, 275 F.3d 769, 772 n.1 (9th Cir. 2001); Sandoval v. Calderon, 241 F.3d 765, 771 (9th Cir. 2001); Calderon v. U.S. District Ct. for the Central District of Cal., 163 F.3d

filed his actual §2254 petition, and therefore that AEDPA applies to this case.

### 1. Supreme Court Cases Concerning Applicability of AEDPA

The relevance of determining the point from which Isaacs' case should be considered to have been "pending" derives from the Supreme Court's decision in Lindh v. Murphy, 521 U.S. 320, 117 S. Ct. 2059 (1997). In that case, the Supreme Court considered whether the provisions of AEDPA applied retroactively to pending cases. The Court's decision that AEDPA should not be applied to most pending habeas cases was based largely on the fact that § 107(c) of the Act expressly stated that chapter 154 of AEDPA – a chapter which sets out special rules expediting §2254 cases when states satisfy certain requirements – should be applied to pending cases. See id. at 327, 117 S. Ct. at 2063. No such retroactivity provision was included in AEDPA chapter 153, the chapter applicable to other §2254 petitions (including Isaacs' petition, if AEDPA applies). The Court noted that "[i]f ... Congress was reasonably concerned to ensure that chapter 154 be

530 (9th Cir. 1998) (en banc). On the other hand, the Fifth, Sixth, Seventh and Tenth Circuits all have held that AEDPA applies unless the habeas petition itself was filed before the Act became effective. See Foster v. Schomig, 223 F.3d 626, 631 n.2 (7th Cir. 2000); Moore v. Gibson, 195 F.3d 1152 (10th Cir. 1999); Gosier v. Welborn, 175 F.3d 504 (7th Cir. 1999); Williams v. Coyle, 167 F.3d 1036 (6th Cir. 1999); Nobles v. Johnson, 175 F.3d 504 (5th Cir. 1997); Williams v. Cain, 125 F.3d 269 (5th Cir. 1997); Holman v. Gilmore, 126 F.3d 876 (7th Cir. 1997).

applied to pending cases, it should have been just as concerned about chapter 153, unless it had the different intent that the latter chapter not be applied to the general run of pending cases." Id. at 329, 117 S. Ct. at 2064. Because Congress considered the two chapters together, the Court stated that the "negative implications raised by disparate provisions are strong[]." Id. at 330, 117 S. Ct. at 2065. After discussing alternative interpretations of the statutory provisions, the Court stated: "We hold that the negative implication of § 107(c) is that the new provisions of chapter 153 generally apply only to cases filed after the Act became effective." Id. at 336, 117 S. Ct. at 2068.

Although Lindh clearly establishes that AEDPA does not apply to "pending" cases, it does not address the issue presented in this case of what event marks the beginning of a habeas case. In addressing that issue, Isaacs points to other recent Supreme Court cases interpreting habeas provisions in a way that supports his contention that a habeas case begins at the time a petition files a motion for appointment of counsel.

First, Isaacs directs us to the Supreme Court's opinion in McFarland v. Scott, 512 U.S. 849, 114 S. Ct. 2568 (1994). In that case, the Supreme Court considered two statutory provisions related to habeas cases: 21 U.S.C. §848(q)(4)(B), which creates a statutory right to qualified legal representation for

10

capital defendants in federal habeas proceedings, and 28 U.S.C. §2251, which grants a federal judge before whom a habeas proceeding is pending the power to stay any related state court proceeding.  The lower courts in McFarland had refused to appoint habeas counsel for the defendant pursuant to §848(q)(4)(B) because the defendant had not yet filed a habeas petition.  Id. at 851-54, 114 S. Ct. at 2570-71.

The Supreme Court began by noting that §848(q)(4)(B) "grants indigent capital defendants a mandatory right to qualified counsel and related services '[i]n any [federal] post conviction proceeding,'" but that the statute did not specify how the right was to be invoked.  Id. at 854, 114 S. Ct. at 2571 (quoting § 848(q)(4)(B)) (brackets in original).  In particular, the statute did not "define a 'post conviction proceeding' under §2254 or §2255 or expressly state how such a proceeding shall be commenced."  Id.  In light of other related provisions, however, the Court held that "§848(q)(4)(B) . . . established a right to preapplication legal assistance."  Id. at 855, 114 S. Ct. at 2572.  The Court found that the "interpretation [of the statute to permit the appointment of counsel prior to the filing of a formal petition] is the only one that gives meaning to the statute as a practical matter," and concluded that:

> The language and purposes of §848(q)(4)(B) and its related provisions establish that the right to appointed counsel includes a right to legal assistance in the preparation of a habeas corpus application. We

therefore conclude that a "post conviction proceeding" within the meaning of § 848(q)(4)(B) is commenced by the filing of a death row defendant's motion requesting the appointment of counsel for his federal habeas corpus proceeding.

Id. at 855-57, 114 S. Ct. at 2572-73.

After reaching that conclusion, the Supreme Court went on to address the similar issue of whether a federal court has authority to stay state court proceedings pursuant to 28 U.S.C. § 2251 prior to the filing of a formal habeas petition. Section 2251 grants any federal judge "before whom a habeas corpus proceeding is pending" power to enjoin related state court proceedings. 28 U.S.C. §2251. McFarland argued "that his request for counsel in a 'post conviction proceeding' under § 848(q)(4)(B) initiated a 'habeas corpus proceeding' within the meaning of §2251, and that the District Court thus had jurisdiction to enter a stay." McFarland, 512 U.S. at 857, 114 S. Ct. at 2573. The Court held that:

> The language of these two statutes indicates that the sections refer to the same proceeding. Section 848(q)(4)(B) expressly applies to "any post conviction proceeding under section 2254 or 2255" – the precise "habeas corpus proceeding[s]" that § 2251 involves. The terms "post conviction" and "habeas corpus" also are used interchangeably in legal parlance to refer to proceedings under §§ 2254 and 2255. We thus conclude that the two statutes must be read in pari materia to provide that once a capital defendant invokes his right to appointed counsel, a federal court also has jurisdiction under § 2251 to enter a stay of execution.

Id. at 858, 114 S. Ct. at 2573.

12

Because the McFarland Court held with respect to both §848 and §2251 that habeas proceedings were commenced with the filing of a motion for appointment of counsel, Isaacs argues that we should also find that his habeas case was pending, for purposes of determining whether AEDPA applies, as of the time he filed his motion for appointment of counsel. If we were to do so then it would follow, of course, that AEDPA would not apply to his petition.

The second Supreme Court case on which Isaacs relies is Hohn v. United States, 524 U.S. 236, 118 S. Ct. 1969 (1998). In Hohn, the Court considered whether it had jurisdiction to review a decision by a court of appeals denying an application for a certificate of appealability (COA). To resolve this issue, the Court had to decide whether a court of appeals' consideration of a COA application constituted a "case." Id. at 241, 118 S. Ct. at 1972. The Court concluded that it did, stating:

> There can be little doubt that Hohn's application for a certificate of appealability constitutes a case under § 1254(1). As we have noted, "[t]he words 'case' and 'cause' are constantly used as synonyms in statutes ..., each meaning a proceeding in court, a suit, or action." Blyew v. United States, 13 Wall. 581, 595, 20 L. Ed. 638 (1871). The dispute over Hohn's entitlement to a certificate falls within this definition. It is a proceeding seeking relief for an immediate and redressable injury, i.e., wrongful detention in violation of the Constitution. There is adversity as well as the other requisite qualities of a "case" as the term is used in both Article III of the Constitution and the statute here under consideration. This is significant, we think,

13

for cases are addressed in the ordinary course of the judicial process, and, as a general rule, when the district court has denied relief and applicable requirements of finality have been satisfied, the next step is review in the court of appeals.

Id.

The Hohn Court also rejected the suggestion that an application for a COA was a threshold matter separate from the merits and over which appellate courts lack jurisdiction, stating:

> Precedent forecloses this argument. In Ex parte Quirin, 317 U.S. 1, 63 S. Ct. 1, 87 L. Ed. 3 (1942), we confronted the analogous question whether a request for leave to file a petition for a writ of habeas corpus was a case in a district court for the purposes of the then-extant statute governing court of appeals review of district court decisions. See 28 U.S.C. § 225(a) First (1940 ed.) (courts of appeals had jurisdiction to review final decisions "[i]n the district courts, in all cases save where a direct review of the decision may be had in the Supreme Court"). We held the request for leave constituted a case in the district court over which the court of appeals could assert jurisdiction, even though the district court had denied the request. We reasoned, "[p]resentation of the petition for judicial action is the institution of a suit. Hence the denial by the district court of leave to file the petitions in these causes was the judicial determination of a case or controversy, reviewable on appeal to the Court of Appeals." 317 U.S., at 24, 63 S. Ct., at 9.

Id. at 246, 118 S. Ct. at 1974-75. Isaacs contends that, in light of McFarland and Hohn, the Court should hold that he instituted his habeas case at the time that he filed his motion for appointment of counsel.

Arguably pointing in the other direction, however, is another recent Supreme

14

Court case that has not yet been discussed by any of the other circuits in connection with the issue before us. In <u>Slack v. McDaniel</u>, 529 U.S. 473, 120 S. Ct. 1595 (2000), the Supreme Court addressed whether pre- or post-AEDPA rules should apply to an appeal filed pursuant to §2253 after AEDPA became effective, when the original petition was filed with the district court before AEDPA.[2] The Court noted that just as § 2254 was directed to petitions filed in district courts after AEDPA, Section 2253 was directed to proceedings initiated in appellate courts after the Act's effective date. <u>Id.</u> at 481, 120 S. Ct. at 1602. Therefore, the Court concluded that AEDPA's rules applied to appeals filed after AEDPA, even though appellate courts would be required "to apply pre-AEDPA law in reviewing the trial court's ruling." <u>Id.</u>

As the State points out, the <u>Slack</u> Court's holding indicates that, at least when a case moves from the district court to appellate court level, it may be divisible so that AEDPA would apply to one aspect of the proceeding, but not to other. The Supreme Court recognized this fact, explaining:

> While an appeal is a continuation of the litigation started in the trial court, it is a distinct step. We have described proceedings in the courts of appeals as "appellate cases." Under AEDPA, an appellate

---

[2]     Section 2253 is the provision governing appeals from a district court's final order in a habeas case. It requires that a COA be granted before an appeal will be entertained. 28 U.S.C. §2253.

case is commenced when the application for a COA is filed.

> When Congress instructs us (as <u>Lindh</u> says it has) that application of a statute is triggered by the commencement of a case, the relevant case for a statute directed to appeals is the one initiated in the appellate court. Thus, § 2253(c) governs appellate court proceedings filed after AEDPA's effective date.

<u>Id.</u> at 481-82, 120 S. Ct. at 1602-03 (citations and quotations omitted). Therefore, a case isn't always just a case. Instead this Court must consider the "relevant case" in order to determine which set of standards apply.

2. Other Circuits' Approaches to this Issue

Having set out the Supreme Court authority relevant to the issue of whether AEDPA applies to Isaacs' petition, we will now discuss the competing approaches taken by our sister circuits in this regard.

As mentioned above, five circuits have considered this exact issue, and all but one have found AEDPA to be applicable under these circumstances. The only circuit so far to have accepted Isaacs' position on when a habeas case is instituted is the Ninth. In <u>Calderon</u>, the en banc Ninth Circuit overruled the position announced in previous decisions and held that, for purposes of determining whether a case was pending when AEDPA took effect in April 1996, courts should look to the date on which the defendant filed a motion for appointment of counsel.

16

163 F.3d at 539-40. Its previous cases had interpreted the Supreme Court's

McFarland decision as applying only to the two statutory provisions presented in

that case (the provisions allowing for appointment of habeas counsel and providing

district courts with authority to stay state court proceedings), but not to the

question of whether a "case" was pending for AEDPA purposes. Id. at 539

(discussing cases). The Calderon court found, however, that the Supreme Court's

intervening decision in Hohn required it to revisit and reverse its position.

In Calderon, the Ninth Circuit interpreted Hohn as indicating that a habeas

case may be initiated by the filing of an application for a COA. Id. The court

focused on the Supreme Court's rejection of the notion that a COA is a threshold

matter separate from the merits of a habeas case. Id. The court then reasoned

that:

> In the wake of Hohn, we must overrule [the Ninth Circuit precedent]
> holding that a habeas corpus "case" is not pending until the habeas
> petition itself has been filed. Hohn's holding, as well as its reliance on
> Ex Parte Quirin that a threshold request for leave to file a petition for
> habeas corpus commences the habeas "case," is simply irreconcilable
> with [those cases]. Like a request for leave to file a habeas petition, a
> petition for the appointment of counsel to prepare and file a petition
> for a writ of habeas corpus, accompanied by a motion for a stay of
> execution under McFarland, is a threshold action that presents a
> "case" to the district court. By analogy to Hohn, it follows that a
> petition for appointment of counsel under McFarland creates a
> pending habeas case. Accordingly, we overrule those [cases] that held
> that a habeas corpus case is pending only when the habeas petition

17

> itself has been filed. A petition for the appointment of counsel to prepare and file a habeas petition, coupled with a motion for a stay of execution, also suffices.

Id. at 540. See also Garceau v. Woodford, 275 F.3d 769, 772 n.1 (9th Cir. 2001) (following Calderon); Sandoval v. Calderon, 241 F.3d 765, 771 (9th Cir. 2001).

Contrary to the Ninth Circuit, four courts of appeals have held that AEDPA applies to § 2254 petitions filed after the Act became effective, even if the defendant had filed a motion for appointment of counsel or for a stay prior to the effective date. The courts which have taken this position have found the Supreme Court cases discussed above distinguishable for several reasons.

The Sixth Circuit's decision in Williams v. Coyle, 167 F.3d 1036 (6th Cir. 1999), is a good example that contains most of the reasons cited by the other circuits for the conclusion that a habeas case is only pending from the time that an actual petition is filed. The Williams court began by noting that "[i]n ordinary usage a case is pending when a complaint or petition is filed." Id. at 1038. Also, the Sixth Circuit noted that habeas cases are generally subject to the Federal Rules of Civil Procedure, see Rule 11 of the Rules Governing §2254 Cases, and Rule 3 of those rules states that "[a] civil action is commenced by the filing of a complaint with the court." Id. After stating that no habeas rules address the specific issue, the court "conclude[d] that Fed. R. Civ. P. 3 yields a presumption that a federal

18

habeas corpus case is filed with the filing of an application for the writ." Id. The court found that "[t]his presumption is reinforced by the language of the habeas corpus provisions," because, for example, Section 2254(e) refers to "a proceeding instituted by an application for a writ of habeas corpus." Id.

After discussing these reasons to believe that a habeas case is only pending after a petition is filed, the Williams court turned to the Supreme Court cases discussed above. The court noted that McFarland "held that a motion for the appointment of counsel constitutes a post conviction proceeding for purposes of 21 U.S.C. §848(q)(4)(B)," and that "a motion for appointment of counsel was sufficient to enable a district court to stay an execution pursuant to 28 U.S.C. 2251, which literally grants this power to a judge 'before whom a habeas corpus proceeding is pending.'" Id. The Sixth Circuit concluded that McFarland did not indicate that a habeas case was pending, for purposes of AEDPA's applicability, simply because a motion for appointment of counsel had been filed, stating:

> [B]oth holdings of McFarland appear to rest on the necessity of
> expanding the ordinary meaning of a "pending case" in order to give
> effect to clear congressional intent. By contrast, we perceive no
> compelling reason to depart from plain meaning in the present case.
> The problem the Court addressed in McFarland was of an ongoing
> nature and had nothing to do with the effective date of any statutory
> provision. In the present case, on the other hand, the defendant faces
> additional procedural hurdles post-AEDPA, but there is no ongoing
> rationale for stretching the "pending" period to reach prior to the

19

actual filing of the application as there was in <u>McFarland</u>. Once all cases in which a petitioner initiated some habeas corpus-related legal action prior to the effective date of the AEDPA have been resolved, the point at which a § 2254 case is "filed" will become irrelevant.

<u>Id.</u> at 1039. <u>Williams</u> acknowledged that <u>McFarland</u> contains language which could be interpreted as meaning that a §2254 case in general begins with the filing of a motion for appointment of counsel, but rejected such a broad reading, concluding instead that "this reading is warranted only to the extent necessary to give effect to §848(q)(4)(B)." <u>Id.</u>

The Sixth Circuit then turned to the Ninth Circuit's decision in <u>Calderon</u>, and rejected the Ninth Circuit's interpretation of the effect of the Supreme Court's <u>Hohn</u> decision. <u>Id.</u> The court stated that:

> In our opinion <u>Hohn</u> and <u>Ex parte Quirin</u> stand only for the proposition that the denial by the district court of a motion for the issuance of a COA, a motion for leave to file a petition for the writ, or, as in our case, a motion for the appointment of counsel pursuant to 21 U.S.C. §848(q)(4)(B) would constitute an appealable case. This does not imply, however, that the petitioner's <u>habeas corpus case</u> has been initiated by the filing of such a preliminary motion. Although the Court in <u>Hohn</u> rejected the contention that the filing of a preliminary motion "should be regarded as a threshold inquiry separate from the merits," <u>Hohn</u>, 118 S. Ct. at 1974-75, the holding and logic of the case were limited to the determination that the rejection by the district court of the preliminary motion constitutes an appealable case. Thus, we do not believe that <u>Hohn</u> dictates the result sought by Williams.

<u>Id.</u> at 1040.

Having rejected an interpretation of Hohn that would have the motion for appointment of counsel mark the beginning of a habeas case, the Sixth Circuit then stated that it agreed with a pre-Hohn Seventh Circuit opinion that stated:

> Although it is linguistically possible for this "preapplication legal assistance" to open a "case" having some affinity to a petition under §2254 . . . the motion for counsel is not itself a petition, because it does not call for (or even permit) a decision on the merits. And it is "the merits" that the amended § 2254(d)(1) is all about.

Id. (quoting Holman v. Gilmore, 126 F.3d 876, 880 (7th Cir. 1997)). Therefore, the Sixth Circuit concluded that "a federal habeas corpus case is filed or pending for purposes of Lindh and the AEDPA only when the petition for the writ is filed." Id.

More recently, the Seventh Circuit addressed the effect of Hohn and the Ninth Circuit's Calderon opinion, and Judge Easterbrook stood by the court's earlier approach, stating:

> The question in Hohn was whether an application for a certificate of appealability is a "case" in the court of appeals, and therefore amenable to review on writ of certiorari under 28 U.S.C. § 1254. The answer to that question does not bear on the issue in Holman and Calderon: whether an application for counsel under 21 U.S.C. §848(q)(4) is a "case pending" under Chapter 153 of the Judicial Code – the critical question for application of the AEDPA. We did not doubt in Holman that a request for counsel is a "case" in the sense that it is subject to appellate review (and, if need be, review by the Supreme Court). Indeed, Gosier's request for counsel was reviewed by this court on appeal, after the district judge dismissed his application. But a request for counsel under §848(q)(4), part of Title 21, is not a case under Chapter 153 of Title 28 – that is, the request is

21

not a collateral attack on a criminal judgment. This rationale of Holman was ignored by the ninth circuit, and we are not persuaded by a decision that avoided the fundamental issue. So we apply the AEDPA to Gosier's case.

Gosier v. Welborn, 175 F.3d 504, (7th Cir. 1999) (citations omitted).

The opinions of the other circuits add little to the analysis performed by the Sixth and Seventh Circuits. In two opinions, both of which pre-dated Hohn, the Fifth Circuit found that McFarland simply did not address the issue of when a case was pending for AEDPA purposes, but was instead "intended to resolve practical procedural problems" related to the two specific statutory provisions at issue in that case. Williams v. Cain, 125 F.3d 269 (5th Cir. 1997); see also Nobles v. Johnson, 127 F.3d 409, 414 (5th Cir. 1997) (same). Similarly, in Moore v. Gibson, 195 F.3d 1152 (10th Cir. 1999), the Tenth Circuit agreed that "McFarland focused on the need to expand the ordinary meaning of a pending case to give effect to Congressional intent," and did not address when a case is pending for AEDPA purposes. Id. at 1162.

### 3. AEDPA Applies

We conclude that the better reasoned approach is the one taken by the majority of the other circuits that have faced the issue before us, and we hold that

22

the relevant date for purposes of judging AEDPA's applicability to a habeas petition is the date on which the actual §2254 petition was filed.

In reaching this conclusion, we acknowledge that some of the language used by the Supreme Court in McFarland and in Hohn supports Isaacs' contention that his case began with the filing of a motion for appointment of counsel. However, we think that the best reading of McFarland is that it was concerned only with interpreting and giving effect to two, narrow statutory provisions. It would be a stretch to find that the decision indicates that for all purposes, a habeas case is pending from the time that a motion for appointment of counsel is filed. Nothing in McFarland precludes the result we reach today.

Likewise, Hohn was limited to the relatively narrow issue of whether an application for a COA initiated a case or controversy over which appellate courts could exercise jurisdiction consistent with Article III of the Constitution. We agree with the Seventh Circuit that "[t]he answer to that question does not bear on . . . whether an application for counsel . . . is a 'case pending' under Chapter 153 of the Judicial Code – the critical question for application of the AEDPA." Gosier, 175 F.3d at 506.

We are persuaded that the Seventh Circuit's approach in Gosier is the correct one. We agree that, in a sense, the filing of a motion for appointment of counsel or

23

other threshold motions might initiate some form of "case," at least in the constitutional sense. However, such a motion does not necessarily mark the genesis of the habeas case under §2254. A motion for appointment of counsel has no relation to the merits of a habeas petition and does not seek any form of merits relief from a district court. Such a motion does not even assure that a habeas case will ever materialize. For example, an appointed counsel could well conclude that the would-be petitioner has no colorable claims to present. Therefore, only when an actual habeas petition is filed seeking relief from a conviction or sentence does § 2254 come into play.

Furthermore, the Supreme Court's opinion in Slack supports the idea that all proceedings that have any relation to a habeas petition do not have to be viewed as a unified whole for purposes of AEDPA. Instead, Slack expressly recognized that a court, in order to determine the applicable law, must determine what is "the relevant case." Id. at 482, 120 S. Ct. at 1603. We believe that it follows – from the Supreme Court's recognition that an appellate case may be subject to AEDPA even though the underlying district court proceedings were not – that even though a motion for appointment of counsel was filed before AEDPA and was not subject to its provisions, a later-filed habeas petition may nonetheless be governed by the stricter AEDPA standards that took effect in the interim. The simple fact is, at the

time AEDPA became the law, Isaacs' habeas case was not pending because it had not yet been filed and he had not asked the district court for any type of merits relief that could be characterized as habeas relief. We hold that the relevant case was not pending when AEDPA became effective, and the district court properly considered Isaacs' petition under AEDPA's standards.

B. Issues Related to the Prayer that Opened Isaacs' Trial

Next we turn to four different issues presented by Isaacs that all relate to the fact that the trial judge allowed his minister to offer an invocation before voir dire at the beginning of Isaacs' trial. Isaacs has contended in his habeas petition that the prayer violated his constitutional rights under the First, Fifth, Sixth, Eighth, and Fourteenth Amendments. In this appeal, however, his arguments are limited to the contention that the giving of the prayer violated his due process rights; therefore he abandoned any other arguments concerning the prayer. Prior to addressing the legal issues, it is necessary for us to explain the facts and the state of the record with respect to the invocation. The court reporter failed to include the content of the prayer as part of the trial transcript. Therefore, all that the transcript reveals concerning the prayer is as follows:

January 4, 1988

25

(A discussion was had in chambers between Court and Counsel, which was not made a part of the record.)

(At 9:30 a.m., court was convened and the following proceedings were had:)

(Invocation)

MR. JACKSON [defense counsel]: We need to approach the bench, Your Honor.

THE COURT: Very good.

(Discussion at the bench as follows:)

MR. SCHIAVONE [defense counsel]: Your Honor, we're going to move to dismiss the panel on the basis of the statements just made by this minister. We think that was highly prejudicial.

MR. JACKSON: Your Honor, there's separation of church and state –

MR. SCHIAVONE: Absolutely, I think that's –

MR. JACKSON: – and for someone to pray in front of all these jurors that they all had their ideas of what should be done and that God's will should be done, not their individual ideas should be done – which is the law of this state – prejudiced the panel. And we move for a mistrial and ask the jury panel to be excluded and excused.

MR. SCHIAVONE: Well, we move for a continuance until we can impanel a new jury, because we can't move for a mistrial at this stage –

MR. JACKSON: That's right.

MR. SCHIAVONE: – because there's no jury panel. So we do move for a continuance, that this panel of jurors has been prejudiced by that

statement.

MR. HILL [prosecutor]: I don't agree, Your Honor. I think it's premature anyway. They have an opportunity to voir dire and ascertain whether or not this panel has been prejudiced.

THE COURT: Very good. The motion is overruled.

At the time of the prayer, a motion to record all proceedings previously had been granted, but Isaacs' trial counsel was not advised that the court reporter failed to record the prayer. Isaacs asserts that his counsel only discovered months later that no record had been made (even though Isaacs presented an affidavit from the court reporter indicating that she stood during the prayer, and defense counsel was present at the time and presumably could have observed her doing so). However, the trial transcript was certified on March 6, 1988, so counsel should have been aware of the omission by the time of the June 1988 proceedings on the motion for a new trial (the "new trial proceedings"). And we know that counsel was aware at least by the time of the direct appeal.[3]

---

[3] According to the court reporter, the trial judge became aware that the prayer had not been recorded on the same day that it was given. Isaacs states that he was unaware of this fact prior to the federal habeas case. He argues that if the judge had promptly informed him that the prayer had not been recorded, he would have had a better chance of recreating a transcript of the prayer. For example, as the court reporter's affidavit pointed out, a media center was set up for the trial where media could observe and record the proceedings, so there is a likelihood that the text of the prayer could have been reconstructed if a prompt effort to do so had

Isaacs first challenged the propriety of the invocation during his direct appeal to the Georgia Supreme Court, but at that time he apparently made no effort to establish the contents of the prayer. Isaacs, 386 S.E.2d at 327. The court held that beginning a trial with an invocation is not a per se violation of the constitution, and that, without more information concerning the content of the prayer, Isaacs was not entitled to relief. Id.

The first attempt to make a precise record of the contents of the prayer was apparently during the state habeas proceedings, almost six years after the invocation was given. On state habeas review, Isaacs claimed that his trial counsel had been ineffective by allowing the prayer to take place and by not ensuring that the prayer was recorded. In those proceedings, both parties were allowed to put forth evidence concerning the contents of the prayer. Isaacs' trial attorney testified that he recalled the minister saying: "Lord, we all know why we are gathered here. We know you know what you want done to this man. Let us do

been made.

But Isaacs has had an opportunity to attempt to recreate the missing portion of the record on earlier occasions – i.e. during the new trial proceedings and when the Georgia Supreme Court remanded so that other, unrelated parts of the record could be recreated. See Isaacs, 386 S.E.2d at 327 (noting that Isaacs had opportunity to recreate the record during earlier remand). Isaacs apparently made no effort to recreate a transcript of the invocation on either occasion, even though he was or should have been aware that it was missing from the trial transcript.

your bidding or your will." He also testified that the prayer referenced "God's will" and "man's law."

The trial judge also testified concerning the contents of the prayer during the state habeas proceedings. He stated that he invited his minister to give the invocation at the beginning of Isaacs' trial, and that he had given the minister no "specific instructions" concerning the contents of the prayer. The judge testified that he did not recall exactly what the minister said in the prayer, but that it was "very innocuous" and had not, in his opinion, "prejudiced the defense" or "favored the state." The prosecutors also testified that they had no specific recollection regarding the contents of the prayer, but stated that they recalled the prayer as being of a neutral nature. One prosecutor testified: "I can tell you now that if I had sensed that something improper was said, given the nature of this case, that I would have immediately asked that new venire persons be brought in."

In its order denying habeas relief, the state habeas court "accept[ed] the recollection of the trial court as to the neutral nature of the prayer offered in this case, as confirmed by the testimony of [the prosecutor]," and held that Isaacs had failed to show that he was prejudiced by the invocation. State Habeas Order, p. 17.

After filing his federal habeas petition, Isaacs sought discovery and an

29

evidentiary hearing concerning the prayer. Isaacs pointed to the allegedly new information provided by the court reporter concerning the trial judge's early knowledge that the prayer had not been recorded. Also, in addition to challenging the prayer itself, Isaacs asserted claims based on the failure to record the prayer and on the ineffective assistance of his counsel in not ensuring that it was recorded or promptly reconstructed. The district court denied Isaacs' request for discovery or an evidentiary hearing on this issue, pursuant to § 2254(e)(2), and denied on the merits Isaacs' claim that the mere giving of the prayer itself violated the constitution. The court found the "failure to record" claim and the ineffective assistance claim to be procedurally barred.

1. The Permissibility of Discovery or an Evidentiary Hearing Regarding the Contents of the Prayer

We will first address the issue of whether the district court erred by denying Isaacs' request for discovery and/or an evidentiary hearing concerning the contents of the invocation. In particular, Isaacs sought permission to take discovery from the media sources who were present at his trial to determine whether they had any records of the contents of the prayer. We conclude that the district court properly

denied Isaacs' requests for discovery or a hearing under the standards imposed by 28 U.S.C. §2254(e)(2).

The Supreme Court has recognized that "[a] habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of course." Bracy v. Gramley, 520 U.S. 899, 904, 117 S. Ct. 1793, 1796-97 (1997). Rule 6(a) of the Rules Governing § 2254 Cases states:

> A party shall be entitled to invoke processes of discovery available under Federal Rules of Civil Procedure if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise.

In interpreting the "good cause" portions of this rule, the Supreme Court noted that "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry." Id. at 908-09, 117 S. Ct. at 1799 (citation and quotation omitted). The Court has noted that the rules "afford the district court substantial discretion in the conduct of a case," including "a degree of discretion in determining whether to hold an evidentiary hearing." Lonchar v. Thomas, 517 U.S. 314, 326, 116 S. Ct. 1293, 1300 (1996).

In passing AEDPA,[4] however, Congress modified the discretion afforded to the district court and erected additional barriers limiting a habeas petitioner's right to discovery or an evidentiary hearing. Section 2254(e)(2) states:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that–
>
> (A) the claim relies on–
>
> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>
> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. §2254(e)(2).

The Supreme Court interpreted §2254(e)(2) in its opinion in Michael Williams v. Taylor, 529 U.S. 420, 120 S. Ct. 1479 (2000). The Court considered whether the "failed to develop" language in the opening clause of the provision indicates that the §2254(e)(2) bar is only applicable when a habeas petitioner has

---

[4] Even before AEDPA, the Supreme Court in Keeney v. Tamayo-Reyes, 504 U.S. 1, 112 S. Ct. 1715 (1992), had limited the discretion of federal judges in this regard.

not been sufficiently diligent in his efforts to develop a record in state courts. The Court concluded that this language imported a "threshold standard of diligence," such that the discovery provisions of §2254(e)(2) only apply if the petitioner was not reasonably diligent in trying to develop the factual record while in state court. Id. at 433-34, 120 S. Ct. at 1489. The Court held that "[d]iligence for purposes of the opening clause depends upon whether the prisoner made a reasonable attempt, in light of information available at the time, to investigate and pursue claims in state court." Id. at 435, 120 S. Ct. at 1490. The applicability of the provision is not dependant on "whether those efforts could have been successful." Id. See also Breedlove v. Moore, 279 F.3d 952, 959-60 (11th Cir. 2002) (discussing Michael Williams and application of §2254(e)(2)).

After discussing the meaning of §2254(e)(2), the Supreme Court went on to find that an evidentiary hearing was not required with respect to the claims of which Williams was on notice while in state court, but that discovery was required as to a claim of juror and prosecutorial misconduct of which the petitioner had no reason to know while in state courts. Michael Williams, 529 U.S. at 438-445, 120 S. Ct. at 1491-94.

Isaacs argues that his request for discovery is similar to the ones which the Supreme Court found should have been permitted in Michael Williams. He

33

contends that, as with the petitioner in <u>Michael Williams</u>, he had no reason to know the extent of his claim while in state court because he only found out during federal habeas that the trial judge had been aware from the first day of trial that the prayer had not been recorded.

We conclude that the district court did not err under either Rule 6(a) or §2254(e)(2) by finding that Isaacs was not entitled to discovery or an evidentiary hearing on his prayer-related claims. As the district court pointed out, Isaacs was aware of the failure to record the prayer at least by the time of his direct appeal. He had opportunities to reconstruct the contents of the prayer both during the new trial proceedings, which were conducted more than five months after conviction and sentence, and again when the Georgia Supreme Court remanded the case to the trial court to permit the reconstruction of another portion of the record. On both occasions he failed to do so. Isaacs was also allowed to present evidence concerning the contents of the invocation during state habeas proceedings, at which time he was able to question several of the relevant participants from his trial. Therefore, we believe that any failure to reconstruct the contents of the prayer at this stage, over 10 years after he became aware of the omission from the trial transcript, must be attributed to Isaacs' lack of diligence during the state court proceedings.

We also find of no consequence Isaacs' allegation that he only learned after his federal habeas petition was filed that the trial court had become aware of the failure to record the prayer on the same day that it happened. We do not see the relevance of that discovery given that Isaacs asserts no separate claim based on any improper action by the trial court in this regard. Instead he simply asserts the same claims that he had previously asserted. Moreover, even if that issue were relevant, it could have been discovered and explored during the new trial proceedings, or on the initial remand from the Georgia Supreme Court at which time other portions of the record were reconstructed, or at the evidentiary hearing held by the state habeas court. The trial judge actually testified during the latter proceeding, and Isaacs had the opportunity to cross-examine him.[5]

We also do not agree that the Supreme Court's decision in <u>Dobbs v. Zant</u>, 506 U.S. 357, 113 S. Ct. 835 (1993) shows that Isaacs is entitled to the discovery or evidentiary hearing that he seeks. In that case, the Supreme Court found that this Court had erred by failing to allow the petitioner to supplement the record to include the transcript of closing arguments that the parties thought had been lost,

---

[5] Indeed, the fact that the trial judge was aware of the failure to record earlier than Isaacs may be barred from our consideration by §2254(e)(2) because it was not developed in state court. In light of our view that the fact is without significance for the merits of the issues before us, we need not address that.

but was subsequently found.  Id.  The Court stated that it had "emphasized the importance of reviewing capital sentences on a complete record," and noted that the supplement to the record should have been permitted because "[t]here can be no doubt as to the transcript's relevance" to the decisions of the lower courts.  Id. at 358-59, 113 S. Ct. at 836.

In contrast to Dobbs, Isaacs is not in possession of, nor is he likely to gain possession of, a transcript of the prayer given at trial.  He does not explain why the discovery that he seeks now is any different from the discovery that was available to him in state courts.  Under these circumstances, we conclude that the district court properly denied Isaacs' request to conduct additional discovery concerning the prayer because he neither exercised sufficient diligence to satisfy the requirements of §2254(e)(2) nor showed "good cause" as required by Rule 6(a).


2.  The Constitutional Permissibility of the Invocation

Next, we consider Isaacs' contention that the invocation given prior to voir dire violated his due process rights.  When this issue was presented to the Georgia Supreme Court on direct appeal, the court noted that it lacked a record of the content of the prayer, and held that the giving of a prayer at the beginning of a criminal trial was not a per se violation of the constitution.  Isaacs, 386 S.E.2d at

327. Then during the state habeas proceedings, after Isaacs put forth evidence concerning the contents of the prayer, the state court accepted the testimony of the trial judge to the effect that the invocation was "neutral" and had not "prejudiced the defense" or "favored the state." Therefore, the state habeas court held that the actual prayer given at Isaacs' trial had not violated his constitutional rights. As we will explain below, we must accept these rulings and findings by the state courts, and, consequently, Isaacs is not entitled to relief on this claim.

As we explained above, the strict standards adopted by Congress in AEDPA apply to Isaacs' habeas petition. Therefore, we look to § 2254(d) and 2254(e)(1) to determine the permissible scope of our review. Section 2254(d), which addresses our treatment of state court adjudications of federal constitutional claims, states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. §2254(d).

In addition, Section 2254(e)(1) addresses the deference that federal courts

37

must give to fact-finding by the state courts, stating:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. §2254(e)(1).

The Supreme Court addressed the meaning of §2254(d)(1) in Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000). The Court recognized that the provision "places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court." Id. at 412, 120 S. Ct. at 1495. We recently summarized the Williams holding and other standards applicable to §2254(d), stating:

> The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) are separate bases for reviewing a state court's decisions. A state court decision is "contrary to" clearly established federal law if either (1) the state court applied a rule that contradicts the governing law set forth by Supreme Court case law, or (2) when faced with materially indistinguishable facts, the state court arrived at a result different from that reached in a Supreme Court case.
>
> A state court conducts an "unreasonable application" of clearly established federal law if it identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case. An unreasonable application may also occur if

38

a state court unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context. Notably, an "unreasonable application" is an "objectively unreasonable" application.

Lastly, § 2254(d)(1) provides a measuring stick for federal habeas courts reviewing state court decisions. That measuring stick is "clearly established Federal law." 28 U.S.C. § 2254(d). Clearly established federal law is not the case law of the lower federal courts, including this Court. Instead, in the habeas context, clearly established federal law "refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state court decision."

Putman v. Head, 268 F.3d 1223, 1241 (11th Cir. 2001) (citations and quotations omitted).

In applying the "contrary to" prong of §2254(d), we have recognized that where no Supreme Court precedent is on point, "we cannot say that the state court's conclusion . . . is contrary to clearly established Federal law as determined by the U.S. Supreme Court." McIntyre v. Williams, 216 F.3d 1254, 1258 (11th Cir. 2000).

We first address whether the Georgia Supreme Court's holding that the invocation was not a per se violation of the constitution constituted a "decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. §2254(d)(1). Isaacs has pointed to no Supreme Court precedent which has held

39

that the giving of a prayer at trial is a per se violation of the constitution, and we have found none. Thus, we hold that the Georgia Supreme Court's decision was not contrary to clearly established federal law as determined by the Supreme Court.

We next consider whether the Georgia Supreme Court's decision involved an unreasonable application of such federal law. In support of his position, Isaacs cites Caldwell v. Mississippi, 472 U.S. 320, 105 S. Ct. 2633 (1985) (finding an Eighth Amendment violation when the sentencer in a capital case is led to believe that the ultimate responsibility for determination of the sentence rests elsewhere). The Georgia Supreme Court noted that the record did not disclose the content of the prayer, even though the case had been remanded on motion by the defendant for purposes of completion of the record. With no indication of the content of the prayer before the Georgia Supreme Court, and thus with no indication that the jury's sense of responsibility was undermined, we cannot conclude that the decision of the Georgia Supreme Court involved an unreasonable application of Caldwell.

Isaacs also cites Lemon v. Kurtzman, 403 U.S. 602, 91 S. Ct. 2105 (1971), and a Fourth Circuit case, North Carolina Civil Liberties Union Legal Foundation v. Constangy, 947 F.2d 1145 (4th Cir. 1991) (applying Lemon's test for determining whether there has been an establishment of religion). We readily

40

conclude that the Georgia Supreme Court's decision – that beginning a criminal trial with a prayer does not warrant a per se reversal of a criminal conviction – does not involve an unreasonable application of <u>Lemon</u>.

With no record of the content of the prayer, the Georgia Supreme Court was addressing a claim with respect to which Isaacs had proven no prejudice. The Fourth Circuit's decision in <u>Constangy</u> involved an attempt to enjoin a trial judge's practice of opening trials with a prayer delivered by the judge himself. The challenge was pursuant to the Establishment Clause with respect to which the court noted that it was not necessary to prove actual prejudice. <u>See</u> <u>Constangy</u>, 947 F.2d at 1152 (distinguishing <u>United States v. Bakker</u>, 925 F.2d 728 (4th Cir. 1991), which had vacated a sentence because a judge's personal religious views entered into the sentencing process). We note, of course, that the Fourth Circuit cases are not determinations by the Supreme Court, and thus cannot guide our analysis. Moreover, nothing in the Fourth Circuit cases indicates that a conviction violates the constitution and must be set aside merely because the trial was begun with a prayer with respect to which no prejudice has been proven. <u>See</u> <u>also</u> the case cited by the Georgia Supreme Court, <u>United States v. Walker</u>, 696 F.2d 277 (4th Cir. 1982) (holding that even if beginning a criminal trial with a prayer violated the First Amendment, reversal was not warranted unless the prayer substantially

41

impaired the fairness of the trial).

We note that in his opening brief on appeal, Isaacs' challenge to the state courts' decisions with respect to the prayer focuses on the decision of the Supreme Court of Georgia, and not the decision of the state habeas court.[6]  However, his argument assumes his own version of the content of the prayer, and ignores the findings of fact in this regard by the state habeas court.  For the first time in his reply brief, Isaacs acknowledges the finding of the state habeas court; he argues that it was a legal conclusion and not a factual determination.[7]  Despite Isaacs' urging that we accept the testimony of his trial counsel concerning the words used

---

[6]      Thus, as an alternative holding, we hold that Isaacs has waived any challenge that the decision of the state habeas court involved an unreasonable application of clearly established federal law as determined by the Supreme Court. See United States v. Ardley, 242 F.3d 989 (11th Cir. 2001) ("[W]e apply our well-established rule that issues and contentions not timely raised in the briefs are deemed abandoned."); Hartsfield v. Lemacks, 50 F.3d 950, 953 (11th Cir.1995) ("We note that issues that clearly are not designated in the initial brief ordinarily are considered abandoned." (citations and quotations omitted)).

[7]      We reject Isaacs' argument that the finding of neutrality was not a finding of fact.  At the evidentiary hearing before the state habeas judge, there was testimony with respect to the contents of the prayer by Isaacs' trial attorney, the prosecutors and the trial judge.  There was substantial inconsistency between the testimony of Isaacs' trial counsel, on the one hand, and, on the other hand, the testimony of the trial judge and the prosecutors.  The state habeas judge expressly accepted the recollection of the trial judge that the nature of the prayer was neutral. The habeas court also noted that the trial judge's testimony was confirmed by the testimony of one of the prosecutors.  This is a finding of fact; moreover, it appears to be based upon credibility choices.

by the minister, we find that we are constrained by §2254(e)(1) to credit the state habeas court's findings of fact in this regard. As mentioned above, this provision requires that we presume a state court's findings of fact to be correct unless a petitioner shows otherwise by clear and convincing evidence. In this case, Isaacs has not carried that burden, and therefore we accept as true the state habeas court's finding that the prayer was neutral in nature. We also take into account the uncontested facts that the prayer was given prior to voir dire, that the defense was permitted to and did question jurors about the prayer or other religious issues during voir dire, and that the invocation occurred 26 days before the jury sentenced Isaacs to death.[8]

In light of these facts concerning the content and context of the invocation, we cannot conclude that the state habeas court acted contrary to, or unreasonably applied, existing Supreme Court precedent in holding that the prayer did not violate Isaacs' due process rights. See 28 U.S.C. §2254(d)(1).


3. Procedural Default of Claim Regarding Failure to Record Prayer

Next, we turn to Isaacs' claim that the failure to record the invocation

_____

[8]    See Walker, 696 F.2d at 282, considering that the jury's deliberations did not begin until 6 days after the prayer as a factor influencing its finding that a prayer given at the beginning of a criminal trial was not prejudicial.

violated his constitutional rights. Both the state habeas court and the district court found this claim to have been procedurally barred by Isaacs' failure to raise the claim on direct appeal. Isaacs maintains that the failure to record issue was not procedurally defaulted because his 764-page direct appeal brief, enumerating 153 separate errors (not including this one), contained a footnote which stated:

> Appellant had filed and had granted (mot. 9/28/87, p. 90) a motion to record all proceedings (R-202. 638). Nevertheless the "invocation" was not recorded. It is believed however that uncontradicted objections set out the objectional [sic] statements, preserve this issue, and idea of an invocation is a death penalty trial. [sic] Error is, of course, hereby claimed in the failure to record and transcribe same. See Wilson v. State, 246 Ga. 672, 273, S.E.2d 9 (1980); Parrott v. State, 134 Ga. App. 160 (1975), State v. Graham, 246 Ga. 341, 271 S.E.2d 627 (1980).

Isaacs' Opening Brief on Direct Appeal, p.306 n.28. The Georgia Supreme Court did not address this issue in its decision.

We agree that Isaacs' failure to record claim is procedurally defaulted. On facts more favorable to a federal habeas petitioner than the facts of this case, the Supreme Court held that the petitioner had failed to fairly present a federal claim to the state courts. See Duncan v. Henry, 513 U.S. 364, 115 S. Ct. 887 (1995). The Court stated:

> In Picard v. Connor, 404 U.S. 270, 275, 92 S. Ct. 509, 512, 30 L. Ed.2d 438 (1971), we said that exhaustion of state remedies requires that petitioners "fairly presen[t]" federal claims to the state courts in

44

order to give the State the " 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights" (some internal quotation marks omitted). If state courts are to be given the opportunity to correct alleged violations of prisoners' federal rights, they must surely be alerted to the fact that the prisoners are asserting claims under the United States Constitution. If a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court.

Id. at 365-66, 115 S. Ct. at 888. In light of Duncan, we agree with the district court that Isaacs did not "fairly present" to the state court a failure to record claim cognizable in federal habeas corpus proceedings. The footnote from Isaacs' direct appeal brief, quoted above, seems to be intended as an indication that Isaacs' prayer claim had been preserved for appeal, and does not seem to have been intended as the statement of a separate and independent failure to record claim. Such a claim is contained, if at all, in a single sentence: "Error is, of course, hereby claimed in the failure to record and transcribe same." This purported one-sentence claim is supported only by citations to state cases. No federal cases were cited, and no language was used by Isaacs which would have alerted the Georgia Supreme Court to the fact that Isaacs was asserting a federal constitutional claim, separate and independent from his prayer claim. Under these circumstances, we readily conclude that Isaacs failed to "fairly present" to the Georgia Supreme Court a federal constitutional claim of failure to record, and thus that the claim is

45

procedurally defaulted.

We also conclude that Isaacs cannot demonstrate "cause" and "prejudice" or "a fundamental miscarriage of justice" in order to excuse the default. "A habeas petitioner can escape the procedural default doctrine either through showing cause for the default and prejudice, or establishing a fundamental miscarriage of justice." Bailey v. Nagle, 172 F.3d 1299, 1306 (11th Cir. 1999) (citations and quotations omitted). In order to show the type of "miscarriage of justice" that will excuse a procedural bar, a petitioner must make "a colorable showing of actual innocence." Id. (citations and quotations omitted).

Isaacs argues that "cause" exists to excuse the procedural default of the failure to record claim because of the information which he allegedly received after the completion of the state court proceedings concerning the timing of when the trial judge learned that the prayer had not been recorded. We can assume arguendo that the trial judge noticed that the court reporter stood up during the prayer, and therefore did not record the prayer, or that the judge otherwise promptly became aware thereof. And we can assume arguendo that that trial defense counsel did not observe that fact and did not become aware thereof during the trial itself. Nevertheless, we do not find those facts significant in light of the fact that counsel was, or should have been, aware that the prayer had not been recorded at least as of

46

the time of the new trial proceedings, but failed to reconstruct the record, and in light of the fact that counsel clearly had such knowledge as of the time of the initial remand from the Supreme Court of Georgia and again failed to reconstruct the record.[9]

Nor can Isaacs demonstrate "prejudice" to excuse his procedural default. As noted above, the state habeas court considered the evidence adduced by Isaacs with respect to the content of the prayer, and found that the content of the prayer was neutral. Thus, we conclude that Isaacs cannot demonstrate "prejudice" with respect to the procedural default in failing to preserve the failure to record claim.[10]

Isaacs also argues that there was no procedural bar because the state habeas court ruled on the merits of this claim. The basis for his argument is that, after explaining why the issue was procedurally defaulted, the state habeas court finished with a conclusory statement to the effect that the ground was without merit. Given the context in which the statement appears (i.e. at the end of a discussion of procedural default), and in light of the fact that there is absolutely no

_____

[9] For the reasons discussed below, Isaacs also cannot demonstrate "cause" on account of ineffective assistance of counsel for failure to recreate the record of the prayer. See infra, at part B.4.

[10] Isaacs has not argued that the "miscarriage of justice" exception, with its actual innocence requirement, applies.

discussion of the underlying merits of the claim, we conclude that the statement does not indicate a ruling on the merits. Instead, the state court was merely indicating that Isaacs was not entitled to relief with respect to the claim in light of the procedural bar. Therefore, the claim is procedurally defaulted.

4.      Procedural Default of Ineffective Assistance Claim Regarding Failure to Recreate Record of Prayer

In his final claim related to the prayer, Isaacs contends that the district court erred in finding procedurally defaulted his claim that he received ineffective assistance of counsel during his new trial proceedings and on appeal in that his counsel failed to recreate the record of the prayer while memories were fresh.[11] The district court found that this claim was not raised in state court, and therefore was procedurally defaulted. We agree. The claim in state court challenged counsel's performance for "failing to assure that such prayer was recorded by the

_____

[11]      Although Isaacs' petition lumps this allegation together with others challenging both trial and appellate counsel, his brief clarifies that, with respect to this claim, he is not challenging the performance of counsel during the trial itself. Accordingly, we construe his claim as challenging only the performance of counsel during the new trial proceedings and on direct appeal.

court reporter."[12]  This claim in the state habeas petition refers to counsel during the trial itself, and his failure to assure that the prayer was recorded.  The claim as presented to the state habeas court makes no reference to the subsequent performance of counsel during the new trial proceedings or on remand from direct appeal, and does not challenge counsel's performance for failure to recreate the record.

By contrast, the claim raised for the first time in federal court challenges the performance of counsel for failing "to create an accurate record of this invocation on a timely basis when memories were fresh, when it became clear that the invocation apparently was not recorded by the court reporter."[13]  Thus for the first

_____

[12]    The claim, Ground 104(c), states in full: "Counsel negligently failed to prevent the trial from starting with a prayer absolving the jurors of responsibility for their decision and compounded this error by failing to assure that such prayer was recorded by the court reporter thus preventing a realistic view on appeal of the prejudicial effect of the prayer."  Supplemental State Habeas Petition, p.3.

[13]    Ground 31(q) of Isaacs' federal habeas petition states:  "Counsel failed to insure that a complete record was made at all proceedings, including the invocation at the beginning of trial, or to create an accurate record of this invocation on a timely basis when memories were fresh, when it became clear that the invocation apparently was not recorded by the court reporter and made part of the record for direct appeal.  Counsel was further ineffective for not conducting and adequate investigation as to what was said in the prayer by talking with eye witnesses to the prayer, including media sources, and presenting this evidence as a motion for a new trial hearing or upon remand for completion of the record by the Georgia Supreme Court."  Federal §2254 Petition, p. 51-52.

time in federal court, Isaacs challenges the performance of counsel during the new

trial proceedings and on direct appeal, and for the first time challenges the

performance for failure to recreate the record.

Having found a procedural default,[14] we address whether or not Isaacs can

demonstrate "cause" and "prejudice," or alternatively whether the "miscarriage of

justice" exception applies.  See Bailey v. Nagle, 172 F.3d 1299, 1306 (11th Cir.

1999).  We readily conclude that Isaacs cannot demonstrate "cause"; the failure of

his state habeas counsel to present this claim cannot constitute "cause."  See

Gonzalez v. Abbott, 967 F.2d 1499 (11th Cir. 1992); Toles v. Jones, 888 F.2d 95,

99-100 (11th Cir.1989), vacated and reh'g en banc granted, 905 F.2d 346 (11th

---

[14]    Isaacs argues that there was no procedural bar because the state habeas court ruled on all of his claims of ineffective assistance of counsel, and that there is no bar where the state court has ruled on the merits.  We need not address Isaacs' attempt to circumvent our decision in Footman v. Singletary, 978 F.2d 1207 (11th Cir. 1992) (holding that petitioner must raise specific instances of ineffective assistance of counsel in state court and that the bar resulting from failure to raise specific instance of ineffective assistance in state court was not excused where there was no indication that the state court "necessarily" evaluated the entire record), because, as pointed out in the text, Isaacs made no claim in state court of ineffective assistance of counsel for failure to recreate the record, and because the state habeas court did not rule on the merits of any ineffective assistance of counsel claims other than those presented to it.  State Habeas Order, p. 22-23.  Nor is there any indication that the state habeas court reviewed the entire record searching for other instances of ineffective assistance of counsel.  Thus, there has been no ruling on the merits of the instant claim as presented in federal court.

Cir.1990), reinstated, 951 F.2d 1200, 1201 (11th Cir.1992) (en banc) (per curiam).

Also, we conclude that Isaacs cannot demonstrate "prejudice." As noted above, Isaacs had a full opportunity to prove the content of the prayer during the state habeas corpus proceedings, but those proceedings resulted in a finding of fact that the content of the prayer was neutral. Therefore, we conclude that Isaacs could not in any event have demonstrated that the failure to record a neutral prayer prejudiced him.[15] Isaacs has not attempted to show "actual innocence," supporting the "miscarriage of justice" exception to procedural default. Therefore, this claim is barred.

C.    The Admission of Statements Regarding Escape Attempts Taken From Isaacs While in Custody

We now turn to Isaacs' claim that his constitutional rights under the 5th and 14th Amendments were violated by the admission into evidence of statements, given while in custody, concerning two escape attempts. The statements came years after he asserted his right to speak with the police only through counsel at and before the time of his trial. Isaacs maintains that the admission of these

---

[15]For the same reasons, Isaacs would have been unable to satisfy the prejudice prong of the ineffective assistance of counsel claim, even if it had not been procedurally barred.

statements during the sentencing phase of his trial, and arguments by the State related to them, violated the Supreme Court's decisions in Edwards v. Arizona, 451 U.S. 477, 101 S. Ct. 1880 (1981), and Arizona v. Roberson, 486 U.S. 675, 108 S. Ct. 2093 (1988).  The Georgia Supreme Court rejected this claim on direct appeal, and we conclude for the reasons that follow that its adjudication of the claim was neither contrary to, nor an unreasonable application of, established Supreme Court precedent.

The custodial statements that are the basis for Isaacs' claim concern two prison escape attempts in which Isaacs was involved.  The first occurred in July 1980 when four death row inmates, but not Isaacs, escaped from Reidsville State Prison.  Isaacs was involved in the planning of that escape attempt, but did not escape with the other inmates because he was transferred earlier in the day of the escape.  The second escape attempt happened in November 1985, but no inmates were successful.  Therefore, the two escape attempts, and the statements made by Isaacs, occurred years after Isaacs' original conviction in 1974 or his initial invocation, in 1973, of his right to speak with police only through counsel.

The facts related to the custodial statements made by Isaacs are as follows. Following each of the 1980 and 1985 escape attempts, Isaacs was required by prison authorities to meet with Agent Robert Ingram of the Georgia Bureau of

Investigations. According to Agent Ingram, prior to interrogating Isaacs, he read Isaacs his Miranda rights, and Isaacs agreed to waive his rights and talk. According to Isaacs, at the time that he was interrogated, he was represented by counsel with regard to the charges for which he was in custody, and the prison had the names and contact information for his attorneys, but his attorneys were not contacted before the interrogations.[16]

At his retrial in 1988,[17] Isaacs moved to suppress the statements concerning the escape attempt, arguing that the statements were taken in violation of Edwards v. Arizona, 451 U.S. 477, 101 S. Ct. 1880 (1981). After conducting a Jackson-Denno hearing,[18] the trial court overruled Isaacs' motion. Afterwards, during the sentencing phase of the trial, the prosecution introduced six statements from Isaacs in order to show both his future dangerousness and his lack of remorse. One of the

---

[16] Isaacs also argued that he was "prohibited" from consulting with his attorneys before these interrogations. The trial court implicitly rejected this allegation when it denied Isaacs' motion to suppress and ruled that his statements were given "freely and voluntarily" after he was informed of his Miranda rights and agreed to waive them.

[17] Isaacs was retried pursuant to the December 9, 1985 decision of this Court granting the writ of habeas corpus and thus necessitating the retrial.

[18] Jackson v. Denno, 378 U.S. 368, 84 S. Ct. 1774 (1964) (holding that trial judge must determine, at a separate hearing, that a confession is voluntary before it may be heard by a jury).

statements was a 48-page, handwritten statement by Isaacs concerning his involvement in the 1980 escape. Another was an hour-long recorded statement concerning the 1985 escape attempt. The prosecution also put on evidence of a statement to the effect that Isaacs said "that he would continue his efforts to escape from confinement." The State focused on this statement in its arguments to the jury in support of the death penalty.

On direct appeal, the Georgia Supreme Court considered Isaacs' challenge to the admissibility of the custodial statements and found that they had been admitted properly because Isaacs had voluntarily waived his Miranda rights with respect to the investigations of the escape attempts. Isaacs, 386 S.E.2d 326-27. In reaching this conclusion, the court did not discuss the applicability of Edwards v. Arizona, 451 U.S. 477, 101 S. Ct. 1880 (1981), or of Arizona v. Roberson, 486 U.S. 675, 108 S. Ct. 2093 (1988). In his brief on direct appeal, however, Isaacs had made an extensive Edwards argument to the Georgia Supreme Court, but did not cite Roberson, which had been decided only recently.

On federal habeas review, the district court found that the Georgia Supreme Court's findings concerning the voluntariness of Isaacs' waiver of his Miranda rights was supported by the evidence. The court also rejected Isaacs' reading of Roberson, concluding that it did not prohibit police from initiating interrogations

54

of prisoners after they have been convicted of the original crime with respect to which they asserted a right to counsel. Therefore, the court rejected Isaacs' contention.

On appeal, Isaacs does not challenge the district court's findings regarding the voluntariness of his consent to interrogation or the facts supporting the Georgia Supreme Court's decision. Instead, he limits his argument to the issue of whether his statements were inadmissible in light of the Supreme Court's decisions in Edwards and Roberson.

1. AEDPA's Limitations on Our Review

Before reaching the merits of Isaacs' claim, we must again consider the extent to which AEDPA circumscribes our review. As discussed above, § 2254(d)(1) prevents us from upsetting a state court adjudication of federal claims unless that adjudication is contrary to, or amounts to an unreasonable application of, established Supreme Court precedent. With respect to Isaacs' Edwards claim, however, we are confronted with the situation in which Isaacs' brief to the state court argued the Edwards decision, but the state court's opinion did not mention it. Therefore, the question becomes whether we should defer to such an adjudication, as long as it is not contrary to, or an unreasonable application of, the relevant

55

Supreme Court decisions.

We have previously brushed up against this issue in two recent cases. First, in Romine v. Head, 253 F.3d 1349, 1365 (11th Cir. 2001), we discussed the effect of §2254(d)(1) where it was unclear whether a state court had adjudicated a federal claim. In the earlier state supreme court opinion, "[the] entire three-sentence discussion of the issue simply [found] 'no reversible error' based upon the bare conclusion that 'nowhere did the prosecutor seriously overstep his bounds,'" and this conclusion was supported only by a string citation to five state court decisions. Id. at 1365 (citation omitted). Therefore, we noted that: "To begin with, it is far from clear what, if any, rule of federal law the Georgia Supreme Court applied." Id. Moreover, the State conceded to this Court that the state supreme court had not applied federal law to Romine's claim. Id. Therefore, we concluded:

> Given all these factors, especially the State's concession, we have grave doubt that the Georgia Supreme Court applied federal law at all, let alone the governing law set down in Supreme Court decisions. Failure to apply that governing law (or the same rule in state law) is tantamount to applying a rule that contradicts governing law, for these purposes. And under Williams that means the federal habeas court will be unconstrained by § 2254(d)(1) because the state-court decision falls within that provision's "contrary to" clause. In other words, when there is grave doubt about whether the state court applied the correct rule of governing federal law, § 2254(d)(1) does not apply. That is what we have here, so we proceed to decide the issue de novo, as the district court did.

Romine, 253 F.3d at 1365 (citations, quotations and footnote omitted).

After Romine, we more recently addressed the issue of the application of §2254(d)(1) in the much more common context of a state court's rejection without discussion of a federal claim presented to it by a defendant. See Wright v. Secretary for Dept. of Corrections, 278 F.3d 1245 (11th Cir. 2002). In Wright, we acknowledged that Romine had "brushed up against" the same issue, but recognized that Romine was a narrow decision, characterizing it as follows:

> In that case, it was unclear whether the federal constitutional issue had been raised and decided in state court – we expressed "grave doubt" that it had been – and the attorneys representing the State insisted that the state court had not addressed the federal issue. In those circumstances, we held that no deference was due the state court's decision of the federal constitutional issue for the simple reason that the state court probably had not decided it. We would not defer to that which did not exist.

Id. at 1254 (citation omitted). In contrast, we stated in Wright that it was not disputed that the issue before us had been presented to and decided by the state court, though without discussion, and we did not "gravely doubt that it was." Id.

Finding Romine distinguishable, we continued in Wright by stating that the issue was "whether the state court's summary, which is to say unexplicated, rejection of the federal constitutional issue qualifies as an adjudication under §2254(d) so that it is entitled to deference." Id. Siding with six other circuits that

had "squarely addressed that question," we concluded that "the summary nature of a state court's decision does not lessen the deference that it is due."  Id.

In reaching this conclusion, we first focused on the fact that "[t]he plain language of § 2254(d)(1) requires only that the federal claim have been 'adjudicated on the merits in State court proceedings' and have 'resulted in a decision' that is neither contrary to nor involves an unreasonable application of Supreme Court precedent."  Id.  In light of these requirements, and noting that "[a] judicial decision and a judicial opinion are not the same thing," we concluded that "[t]he statutory language focuses on the result, not on the reasoning that led to the result, and nothing in that language requires the state court adjudication that has resulted in a decision to be accompanied by an opinion that explains the state court's rationale."  Id. at 1255.  Therefore, we held that in order for the §2254(d)(1) bar to apply, "all that is required is a rejection of the claim on the merits, not an explanation."  Id.

We also noted that, "[t]o conclude otherwise on this issue would be writing into §2254(d)(1) an additional requirement that Congress did not put there – a requirement that the state courts explain the rationale of their decisions," and stated that Congress, and not federal courts, would have to impose such a requirement.  Id.  The Court observed that telling state courts how they must handle cases would

58

run contrary to notions of federalism and comity. Id. Therefore, we concluded: "In §2254(d) Congress meant to, and did, mandate deference to state court adjudications on the merits of federal constitutional issues, and a decision that does not rest on procedural grounds alone is an adjudication on the merits regardless of the form in which it is expressed." Id. at 1255-56.

The instant case is analogous to Wright, and not to Romine. Here, it is apparent to us that the Georgia Supreme Court considered Edwards inapplicable in the context of an interrogation of an inmate in the penitentiary, conducted after a waiver of his Miranda rights, and conducted six to eleven years after his conviction and sentence (and even longer after his pre-trial invocation of the right to counsel during interrogation). As did the panel in Wright, we believe Romine is inapposite. Here, there was no concession by the State that the Georgia Supreme Court failed to address the federal claim. Here, we have no doubt but that the Georgia Supreme Court fairly considered Isaacs' argument that the Edwards elaboration on Miranda should apply, and decided that it did not. Thus, the Georgia Supreme Court cited only Miranda and not Edwards.

Accordingly, Section 2254(d)(1) applies to the Georgia Supreme Court's adjudication, and Isaacs is only entitled to relief if that court's rejection of his claim was contrary to, or an unreasonable application of, the Supreme Court's

decisions in Edwards and Roberson.  As we will explain, we cannot conclude that it was.

2.  The Precedent Concerning Custodial Interrogations

The principal case on which Isaacs bases his claim is Edwards v. Arizona, a decision handed down by the Supreme Court after the 1980 interrogation of Isaacs, but before the 1985 interrogation.  In Edwards, the defendant asserted his right to counsel after having been taken into custody.  451 U.S. at 478, 101 S. Ct. at 1881-82.  At that time the police stopped interrogating Edwards, but they reinitiated questioning the following morning, and Edwards subsequently confessed his guilt.  451 U.S. at 479, 101 S. Ct. at 1882.   The Supreme Court considered whether the police ran afoul of Miranda by reinitiating interrogation after the defendant's invocation of the right to counsel.

The Edwards Court noted that Miranda rights may be waived, but that "waivers of counsel must not only be voluntary, but also constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege, a matter which depends in each case upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused."  Id. at 482, 101 S. Ct. at 1884 (citations and quotations omitted).  The

Court proceeded a step further, however, concluding that an additional,

prophylactic rule protecting the right to counsel was called for, stating:

> [A]lthough we have held that after initially being advised of his
> <u>Miranda</u> rights, the accused may himself validly waive his rights and
> respond to interrogation, the Court has strongly indicated that
> additional safeguards are necessary when the accused asks for
> counsel; and we now hold that when an accused has invoked his right
> to have counsel present during custodial interrogation, a valid waiver
> of that right cannot be established by showing only that he responded
> to further police-initiated custodial interrogation even if he has been
> advised of his rights. We further hold that an accused, such as
> Edwards, having expressed his desire to deal with the police only
> through counsel, is not subject to further interrogation by the
> authorities until counsel has been made available to him, unless the
> accused himself initiates further communication, exchanges, or
> conversations with the police.

<u>Id.</u> at 484-85, 101 S. Ct. at 1884-85. The Supreme Court commented that this

approach was consistent with <u>Miranda</u>'s recognition that "the assertion of the right

to counsel was a significant event and that once exercised by the accused, the

interrogation must cease until an attorney is present." <u>Id.</u> at 485, 101 S. Ct. at

1885. The Court then concluded: "We reconfirm these views and, to lend them

substance, emphasize that it is inconsistent with <u>Miranda</u> and its progeny for the

authorities, at their instance, to reinterrogate an accused in custody if he has clearly

asserted his right to counsel." <u>Id.</u>

The Supreme Court built on <u>Edwards</u> in subsequent cases, including in

Arizona v. Roberson,486 U.S. 675, 108 S. Ct. 2093 (1988), a decision released after Isaacs' conviction but before his direct appeal was completed. In Roberson, the defendant was arrested at the scene of a just-completed burglary, and indicated to the police that he "wanted a lawyer before answering any questions." 486 U.S. at 678, 108 S. Ct at 2096. Three days later, while the defendant was still in custody pursuant to the original arrest, a different police officer interrogated him about a different burglary. Id. The officer conducting the second interrogation was not aware that Roberson had requested the assistance of counsel after he was arrested. Id.

The question before the Supreme Court in Roberson was whether the re-initiation by the police of interrogation concerning a separate offense from the one for which the defendant invoked the right to counsel violated Edwards. The Court held that, after a person in custody invokes the right to counsel, the police cannot initiate interrogation, even if it concerns offenses other than ones for which the person is being held. The Court noted that "the prophylactic protections that the Miranda warnings provide to counteract the 'inherently compelling pressures' of custodial interrogation and to 'permit a full opportunity to exercise the privilege against self-incrimination,' are implemented by the application of the Edwards corollary that if a suspect believes that he is not capable of undergoing such

questioning without advice of counsel, then it is presumed that any subsequent

waiver that has come at the authorities' behest, and not at the suspect's own

instigation, is itself the product of the 'inherently compelling pressures' and not the

purely voluntary choice of the suspect." 486 U.S. at 681, 108 S. Ct. at 2097

(citations and quotations omitted).

The Roberson Court stated that the Miranda and Edwards "bright-line

rule[s]" have the benefit of providing "'clear and unequivocal' guidelines to the

law enforcement profession." Id. at 682, 108 S. Ct. at 2098. The Court then went

on to hold that "the bright-line, prophylactic Edwards rule" applies even if the

police-initiated interrogation concerns a different investigation. Id. The Court

stated that:

> As a matter of law, the presumption raised by a suspect's request for
> counsel – that he considers himself unable to deal with the pressures
> of custodial interrogation without legal assistance – does not
> disappear simply because the police have approached the suspect, still
> in custody, still without counsel, about a separate investigation. . . .
> Roberson's unwillingness to answer any questions without the advice
> of counsel, without limiting his request for counsel, indicated that he
> did not feel sufficiently comfortable with the pressures of custodial
> interrogation to answer questions without an attorney. This discomfort
> is precisely the state of mind that Edwards presumes to persist unless
> the suspect himself initiates further conversation about the
> investigation; unless he otherwise states, there is no reason to assume
> that a suspect's state of mind is in any way  investigation-specific.

Id. at 683-84, 108 S. Ct. at 2099 (citations and quotations omitted).

63

The Roberson Court went on to note that the Fifth Amendment right to counsel is different from the offense-specific, Sixth Amendment right, because the Fifth Amendment right "is protected by the prophylaxis of having an attorney present to counteract the inherent pressures of custodial interrogation, which arise from the fact of such interrogation and exist regardless of the number of crimes under investigation or whether those crimes have resulted in formal charges." Id. at 685, 108 S. Ct. at 2100. The Supreme Court held that the Fifth Amendment, Edwards concerns are not overcome by simply re-apprizing the defendant of Miranda rights before interrogation or by the fact that the later investigation is conducted by a different law enforcement organization. Id. at 686-87, 108 S. Ct. at 2101. Therefore, the Court concluded that the request for counsel must be observed "[w]hether a contemplated reinterrogation concerns the same or a different offense, or whether the same or different law enforcement authorities are involved in the second investigation." Id. at 678-88, 108 S. Ct. at 2101. As the Court stated in a later case again distinguishing the Fifth Amendment right to counsel from the offense-specific Sixth Amendment right, "[t]he purpose of the Miranda-Edwards guarantee . . . is to protect a quite different interest [from the Sixth Amendment]: the suspect's 'desire to deal with the police only through counsel.'" McNeil v. Wisconsin, 501 U.S. 171, 178, 111 S. Ct. 2204, 2209 (1991)

(citation omitted).

The year after <u>Roberson</u>, the Supreme Court revisited <u>Edwards</u> and again extolled the benefits of its "clear and unequivocal" guidelines. See <u>Minnick v. Mississippi</u>, 498 U.S. 146, 151, 111 S. Ct. 486, 490 (1990).[18] In <u>Minnick</u>, the defendant was arrested for murder, and he indicated his desire to have an attorney present. <u>Id.</u> at 498 U.S. at 148, 111 S. Ct. at 488. The defendant met with an attorney the following day, and then, two days after that, police initiated an interrogation during which time he made incriminating statements. <u>Id.</u> at 149, 111 S. Ct. at 488-89. The Supreme Court considered whether the reinterrogation violated <u>Edwards</u>, or whether the protections of <u>Edwards</u> cease after a defendant has the opportunity to consult with an attorney.

In answering this question, the <u>Minnick</u> Court began by reiterating that the purpose behind the <u>Edwards</u> rule was to prevent the badgering of defendants by the police, and to ensure that statements are not the result of coercive pressures by the police. <u>Id.</u> at 150-51, 111 S. Ct. at 489-90. The Court stated:

> <u>Edwards</u> is "designed to prevent police from badgering a defendant into waiving his previously asserted Miranda rights." The rule ensures that any statement made in subsequent interrogation is not the result

---

[18] We note that the <u>Minnick</u> decision was released after Isaacs' conviction became final in August 1990. See <u>Isaacs v. Georgia</u>, 497 U.S. 1032, <u>reh'g denied</u>, 497 U.S. 1051 (1990) (denying cert).

of coercive pressures.

Id. (citations omitted).

The Court then stated that "[t]he merit of the Edwards decision lies in the clarity of its command and the certainty of its application," and held that the "protection of Edwards [does not] terminate[] once counsel has consulted with the suspect." Id. Instead, the Court held that:

> In our view, a fair reading of Edwards and subsequent cases demonstrates that we have interpreted the rule to bar police-initiated interrogation unless the accused has counsel with him at the time of questioning. Whatever the ambiguities of our earlier cases on this point, we now hold that when counsel is requested, interrogation must cease, and officials may not reinitiate interrogation without counsel present, whether or not the accused has consulted with his attorney.

Id. at 153, 111 S. Ct. at 491.[19] Therefore, on several occasions, the Supreme Court has interpreted Edwards broadly in order to provide "clear and unequivocal" rules designed to prevent the badgering of defendants by the police.

Although we have never addressed the applicability of Edwards or Roberson to a defendant in Isaacs' position, this Court has applied these cases in other contexts on several occasions. See Tukes v. Dugger, 911 F.2d 508, 515 (11th Cir.

---

[19] In dissent, Justice Scalia criticized the Court for creating an "irrebuttable presumption that a criminal suspect, after invoking his Miranda right to counsel, can never validly waive that right during any police-initiated encounter, even after the suspect has been provided multiple Miranda warnings and has actually consulted his attorney." Id. at 156, 111 S. Ct. at 493.

1990) (applying <u>Edwards</u> and <u>Roberson</u>); <u>Kight v. Singletary</u>, 50 F.3d 1539, 1548 (11th Cir. 1995) (applying <u>Edwards</u> and <u>Roberson</u>, and noting that the 5th Amendment rights protected by these decisions are not offense-specific).  In addition to these cases applying <u>Edwards</u> and <u>Roberson</u> in a straightforward manner, we also considered limitations on the <u>Edwards</u> rule in <u>Dunkins v. Thigpen</u>, 854 F.2d 394 (11th Cir. 1988).  In that case, we held that "a break in custody dissolves a defendant's <u>Edwards</u> claim."  <u>Id.</u> at 397.

It is in light of this framework that we must decide whether the Georgia Supreme Court unreasonably applied Supreme Court precedent in holding that the <u>Edwards</u> and <u>Roberson</u> protections do not extend to a defendant in Isaacs' position – one who has already been tried and convicted of the crime for which he was taken into custody and with respect to which he asserted a right to counsel. Although we have not had occasion to address this particular issue, some other courts have.

We have found only two cases from our sister circuits addressing the issue of whether the <u>Edwards</u> protections continue to apply to a prisoner who is in custody following conviction for the crime for which he or she initially asserted the right to deal with the police only through counsel, the Eighth Circuit in <u>United States v. Arrington</u>, 215 F.3d 855 (8th Cir. 2000), and the Sixth Circuit in <u>United</u>

States v. Hall, 905 F.2d 959 (6th Cir. 1990).

The Eighth Circuit agreed with the Sixth Circuit's earlier decision in Hall that the Edwards protections do not continue indefinitely just because a person remains in custody. Arrington, 215 F.3d at 856. In doing so, the Arrington court rejected the defendant's argument for suppression of statements which he gave to a federal agent while in confinement for a conviction on an unrelated offense. After reciting the Edwards and Roberson holdings, the court reasoned:

> Although the Fifth Amendment right to counsel continues throughout the duration of police custody, we find no support in Edwards or Roberson for Arrington's contention that the right also "continu[es] ad infinitum," and certainly not where, as here, the accused has entered a guilty plea and has begun serving his sentence. When Arrington was arrested on state charges, he validly invoked his Fifth Amendment right to counsel and that right was scrupulously honored throughout the state proceedings. After pleading guilty to the state flight charge, Arrington was transferred from police custody to correctional custody to serve his sentence. At that point, Arrington was no longer "'in custody' as that term has been used in the context of Edwards and Roberson," and Edwards and Roberson were no longer applicable as a basis for suppressing Arrington's statement to the ATF agent. Thus, the district court properly denied Arrington's motion to suppress his statement.

Id. at 856-57 (citations and quotations omitted). See also United States v. Hall, 905 F.2d 959 (6th Cir. 1990) (the two judges in the majority limiting the reach of Edwards and Roberson by focusing on factual differences including the short time period in the Supreme Court cases between the invocation of the right to counsel

68

and the challenged interrogations, as compared to the three-month time period in Hall, and the fact that Hall was in the penitentiary as a convicted prisoner, unlike the defendants in Edwards and Roberson).

In addition to these two decisions by federal circuit courts, a Maryland appeals court recently addressed at length the issue before us. See Clark v. State, 781 A.2d 913 (Md. App. 2001).  The Clark court discussed the various approaches taken by other courts confronting the issue of whether Edwards protections extend indefinitely, and recognized that courts, including this one,[20] have drawn a distinction between "Miranda custody" and incarceration following a conviction. Id.  945-46.  Based on this distinction, the Clark court held that there is a "break in custody," for purposes of determining whether Edwards applies, after a defendant is convicted and released to the general prison population, stating: "But the extended period of time during which the inmate was incarcerated but was not in Miranda custody is a break in custody that has the effect, like any other break in custody, of allowing his question-proof status to end."  Id. at 947 (citations and

---

[20]	In Garcia v. Singletary, 13 F.3d 1487 (11th Cir. 1994), we held that "a person's status as an inmate does not automatically constitute 'in custody,' for Miranda purposes."  Id. at 1490-91.  Based on this, we held that a prison guard was not required to provide an inmate with a Miranda warning prior to "on-the-scene questioning" after the guard observed the inmate starting a fire because the inmate was not in custody for purposes of Miranda.  Id. at 1492.

quotations omitted).  The court concluded that <u>Edwards</u> and its progeny were

distinguishable, stating:

> <u>Edwards</u>, <u>Roberson</u>, and <u>Minnick</u> were all cases in which
> reinterrogation took place within three days of the prisoner's
> invocations of their right to counsel. The evil sought to be avoided
> was police badgering. But with a gap of more than five years between
> police interrogation sessions, it is impossible to say that the
> Montgomery County police "badgered" Clark into waiving his right to
> counsel. Application of the <u>Edwards</u> rule to cases like the one at hand
> would not help achieve <u>Edwards</u>'s goal of preventing police
> badgering, nor would it accomplish any other discernable public good.
>
> Common sense dictates that, if a rule is devised to prevent badgering a
> suspect into giving up his right to counsel, and because of an immense
> time gap, no badgering even arguably occurred, then blind obedience
> to the rule is not required. Put another way, when, as here, the factual
> circumstances of a case fall into a predictable, potentially recurring
> pattern to which the underlying policy of <u>Miranda</u> and <u>Edwards</u> cease
> to apply, then so too does the bright-line of <u>Edwards</u> cease to shine.

<u>Id.</u> at 947-48 (citations and quotations omitted).  <u>See</u> <u>also</u> Laurie Magid,

<u>Questioning the Question-Proof Inmate: Defining Miranda Custody for</u>

<u>Incarcerated Suspects</u>, 58 Ohio S. L. R. 883(1997) (discussing <u>Edwards</u> cases, and

endorsing approach subsequently adopted by the <u>Clark</u> court).

In contrast to these decisions, some state courts have held that the <u>Edwards</u>

and <u>Roberson</u> protections continue even after a defendant has pleaded guilty to,

and been incarcerated for, the charge with respect to which he originally invoked

his Fifth Amendment right to counsel.  In <u>United States v. Green</u>, 592 A.2d 985

70

(D.C. Ct. App. 1991), the D.C. Court of Appeals found that this conclusion was required in light of the Supreme Court's repeated focus on the "clear and unequivocal" and "prophylactic" nature of the <u>Edwards</u> and <u>Roberson</u> rules. <u>Id.</u> at 987-89. The court noted that, as in Isaacs' case, considerable time had passed since the original invocation of the right to counsel, but the court concluded that:

> [W]e think only the Supreme Court can explain whether the <u>Edwards</u> rule is time-tethered and whether a five-month interval, during which no efforts at custodial interrogation took place, is too long a period to justify a continuing irrebuttable presumption that any police-initiated waiver was invalid. Until the Court provides further guidance, we are persuaded that so long as the defendant remains in custody the fact that the police did not reinitiate interrogation until five months after he invoked his right to counsel cannot be adequate reason, alone or combined with the factors already treated, to justify a departure from <u>Edwards</u>' command.

<u>Id.</u> at 989-90. The <u>Green</u> court also noted that it was significant that the important intervening event in that case – the guilty plea to the original charge – was not inconsistent with the defendant's expressed desire to only deal with the police with counsel present. <u>Id.</u> at 990-91. Therefore, the court found that <u>Edwards</u> and <u>Roberson</u> were still applicable.[21] Accord <u>Kochutin v. State</u>, 813 P.2d 298 (Ak.

_____

[21] The Supreme Court granted certiorari in <u>Green</u> and considered whether the <u>Edwards</u> protections should apply to a defendant in his situation. <u>See</u> <u>United States v. Green</u>, 504 U.S. 908, 112 S. Ct. 1935 (1992). During oral arguments, "a number of justices asked questions that indicated their concern about the duration of Green's question-proof status after he invoked his right to counsel." <u>Clark</u>, 781 A.2d at 941. However, before the Supreme Court issued an opinion in

App. 1991) (holding that the Edwards protections continue to apply indefinitely to a defendant who invokes those rights and remains in custody, even after the defendant is convicted and serving his sentence), vacated by Kochutin v. State, 875 P.2d 778 (Ak. App. 1994) (vacating original decision based on subsequent determination that there was a break in the defendant's custody). Cf. Commonwealth v. Perez, 581 N.E.2d 1010, 1015-17 (Ma. 1991) (assuming but not deciding that Edwards protection continues following conviction and during incarceration, but finding that error was harmless).

In light of this precedent, we conclude for a number of reasons that the Georgia Supreme Court's adjudication of Isaacs' Edwards claim may not be disturbed. As an initial matter, in light of the conflicting authority concerning the reach of Edwards and Roberson under the circumstances of this case, and in particular in light of the decisions by the Sixth and Eighth Circuits holding that Edwards does not apply under facts similar to those in this case, we cannot conclude that the Georgia Supreme Court unreasonably applied, or acted contrary to, relevant Supreme Court precedent. To do so would be to discount or disregard the prevailing trend among the federal circuits as unreasonable.

---

the case, Green was murdered in prison, and the Court never issued a decision. Id. at 940.

Moreover, we find reasonable the approach taken by those courts that have held that Edwards does not apply to a defendant who has been convicted and who remains in custody only in the sense that he is incarcerated as part of the general prison population.[22]  Under such circumstances, we believe that the Georgia Supreme Court acted reasonably by determining that the facts were sufficiently far removed from Edwards and its progeny, and that the concerns over police badgering were sufficiently attenuated, to find that the Edwards protections had ceased.  Edwards is designed to counteract the "coercive pressures" of being in custody.  See Minnick, 498 U.S. at 150-51, 111 S. Ct. at 489-90.  But for Isaacs, and many other inmates who might have invoked the right to counsel at some past time, incarceration in prison is an accustomed milieu and is far from  the potentially coercive situation that gives rise to concerns over police badgering. Therefore, the concerns underlying Edwards and its progeny are weaker under the circumstances of this case.

Similarly, we agree with our sister circuits, as well as the Maryland appellate court in Clark, that nothing in the existing Supreme Court precedent requires the conclusion that the Edwards protections continue ad infinitum, thereby perpetually

_____

[22]    Of course, in light of the restricted scope of our review under AEDPA, we need not and do not adopt this as the law of our circuit.

shielding inmates from questioning regarding crimes unrelated to those which originally led them to invoke the right to counsel. As the Clark court cogently observed: "Edwards, Roberson, and Minnick were all cases in which reinterrogation took place within three days of the prisoner's invocations of their right to counsel." 781 A.2d at 947. Accordingly, we readily conclude that the decision of the Georgia Supreme Court is not "contrary to" clearly established Supreme Court precedent. Indeed, it would be quite a stretch from the facts of those cases to conclude that the same protections continue forever for a defendant who has been convicted and is serving his time in prison.

Also, we believe that the Georgia Supreme Court's decision gains additional support from our decision in Garcia v. Singletary, 13 F.3d 1487 (11th Cir. 1994). In Garcia, we held that "a person's status as an inmate does not automatically constitute 'in custody,' for Miranda purposes." Id. at 1490. In that case, we held that a prison guard who engaged in "on-the-scene questioning" of an inmate whom he observed starting a fire, had not violated Miranda by failing first to inform the inmate of his rights. Id. at 1489-91. We held that the inmate had not been subject to a custodial interrogation, and that Miranda consequently was not implicated. Id. at 1492. Although Garcia did not involve an Edwards claim, we did recognize in that case that, at least for purposes of Miranda (the case on which Edwards is

74

based), incarceration in prison is not necessarily the same as "<u>Miranda</u> custody." This approach recognizes that incarceration in the general prison population is the accustomed milieu for many inmates, rather than the type of coercive situation that was the source of concern in <u>Miranda</u> and its progeny. We see no reason why the Georgia Supreme Court could not reasonably conclude that the same type of reasoning could apply in the <u>Edwards</u> context. If it did so, then the court also could have reasonably concluded, as the Maryland appellate court did in <u>Clark</u>, that incarceration following a conviction constitutes a break in <u>Miranda</u> custody, thereby ending the <u>Edwards</u> protections.

Finally, we are mindful that the Supreme Court has exercised some caution before expanding any judicially-created prophylactic rule beyond the circumstances under which the rule was originally created. <u>See</u> <u>Stone v. Powell</u>, 428 U.S. 465, 96 S. Ct. 3037 (1976). Instead, courts first should engage in a "pragmatic analysis" which takes account of the societal costs of extending such a rule to a new situation. <u>Id.</u> at 488, 96 S. Ct. 3049. As mentioned above, the concerns underlying <u>Edwards</u> and its progeny are certainly attenuated under the facts of this case where there is no evidence of police badgering, the interrogation initiated by the police occurs while the defendant is serving his sentence, and the interrogation takes place years after the defendant's conviction. Under these

75

circumstances, we do not think that the Georgia Supreme Court acted unreasonably by failing to extend Edwards and its progeny to Isaacs' situation.

Therefore, we conclude for all these reasons that the Georgia Supreme Court's adjudication of Isaacs' Edwards claim was neither contrary to, nor an unreasonable application of, established Supreme Court precedent, and it is due to be affirmed pursuant to §2254(d)(1).

D. Evidence, Argument, and Instructions Regarding Isaacs' Lack of Remorse

Next, Isaacs argues that his 5th Amendment rights were violated when the trial court permitted evidence, argument, and jury instructions at the sentencing stage of his trial related to his lack of remorse. Isaacs maintains that these statements violated the Supreme Court's decision in Griffin v. California, 380 U.S. 609, 85 S. Ct. 1229 (1965), because they reflected negatively on his decision not to testify at trial.

The facts concerning this issue center around the trial court's decision to permit the State, at the sentencing stage of trial, to put on evidence relating to Isaacs' lack of remorse in the form of testimony from a television reporter, Mark Piccard. Isaacs made a pre-trial motion to exclude such remorse evidence, which

76

the trial court denied. Piccard was then called as a witness during the sentencing hearing and, over objection, testified that during an interview with Isaacs in the 1970s, Piccard asked Isaacs "[i]f he had it to do all over again, would he do it again." Piccard then testified that "to the best of [Piccard's] recollection," Isaacs responded that "he would."

The State utilized Piccard's testimony concerning Isaacs' lack of remorse in its closing argument, stating:

> The evidence in this case is showing you something else about Carl Isaacs. Mark Piccard talked to him – he didn't know exactly when, but it was '77 or '78 – and he asked him about the Alday family. He asked him about those people. And you remember what Mark Piccard said? He said, I was stunned by the frankness of his answer, because he said he would do it again.

After closing arguments, the trial court agreed to give the following jury instruction concerning remorse:

> In considering all of the evidence from both phases of trial, you should consider all of the aspects of the crime, all aspects of the defendant's character, including but not limited to, . . . any evidence of remorse or lack thereof. . . .

Isaacs objected to this instruction, arguing that it was an improper comment on Isaacs' decision not to testify. The State argued that the instruction was permissible, and pointed to Piccard's testimony. The trial court agreed with the State and gave the instruction.

77

On direct appeal, Isaacs challenged both the prosecutor's comments concerning Isaacs' lack of remorse, and the trial court's instruction concerning remorse. The Georgia Supreme Court rejected Isaacs' arguments, stating:

> Contrary to the defendant's contention, the defendant's remorse or lack thereof is a permissible area of inquiry during sentencing. Fair v. State, 245 Ga. 868(4), 268 S.E.2d 316 (1980). Compare, cf., U.S. v. Reed, 882 F.2d 147, 150-51 (5th Cir.1989) (approving federal sentencing guidelines provision for reduction of sentence when defendant demonstrates "affirmative acceptance of personal responsibility" manifested by "sincere contrition" (emphasis supplied)).

> Piccard's testimony was not otherwise inadmissible. See Division 30, post.

Isaacs, 386 S.E.2d at 323. The later portion of the opinion cited to in this section, Division 30, supports the proposition that Piccard's testimony was admissible because "[t]here is no evidence [Piccard] was acting as an agent of the state, or that Isaacs' statement was not voluntary." Id. at 330. Finally, the Supreme Court rejected Isaacs' contention that the prosecutor's closing argument was improper, stating Isaacs had not objected to the argument at trial and that the argument did not entitle Isaacs to relief because it "did not result in the sentence of death being imposed under the influence of passion, prejudice, or any other arbitrary factor." Id. at 333 (citation and quotation omitted).

In his federal habeas petition, Isaacs again pressed these challenges –

78

Ground 15 related to the evidence and prosecutorial argument and Ground 21 related to the jury charge.   Isaacs argued that the Fifth, Sixth, Eighth and Fourteenth Amendments were violated by the remorse evidence, argument and jury instruction. **[RE64:76]**  The district court held that the Georgia Supreme Court's decision was neither an unreasonable application of, nor contrary to, Supreme Court precedent, and that Isaacs' claim was therefore due to be denied pursuant to §2254(d)(1).

As mentioned above, even though the Georgia Supreme Court did not expressly discuss the Supreme Court's  Griffin decision or any other federal cases (although the federal constitutional claim was presented) in disposing of Isaacs' claims relating to remorse, we assume that the court adjudicated those claims, and we must affirm the denial of habeas unless the result it reached would be contrary to, or an unreasonable application of, established Supreme Court precedent. See Wright v. Secretary of Dept. of Corrections, 278 F.3d 1245 (11th Cir. 2002).

To begin with, we will look at the federal case law relevant to Isaacs' claims. His claims are based on the Supreme Court's opinion in Griffin v. California, in which the Supreme Court addressed whether it was permissible for a trial judge to instruct the jury in a criminal trial that it could draw an unfavorable inference from a defendant's decision to remain silent at trial.  380 U.S. 609, 85 S. Ct. 1229

(1965). The Court concluded that a rule permitting such an inference violated the

Fifth Amendment because:

> It is in substance a rule of evidence that allows the State the privilege
> of tendering to the jury for its consideration the failure of the accused
> to testify. No formal offer of proof is made as in other situations; but
> the prosecutor's comment and the court's acquiescence are the
> equivalent of an offer of evidence and its acceptance.

Id. at 613, 85 S. Ct. at 1232.  The Court noted that the decision to remain silent is

not inconsistent with innocence in our legal system.  Id.  at 613-15, 85 S. Ct. at

1232-33.  It also noted that a jury might draw a negative inference from silence,

even without comment by the prosecutor or judge, but stated: "What the jury may

infer, given no help from the court, is one thing.  What it may infer when the court

solemnizes the silence of the accused into evidence is quite another."  Id. at 614, 85

S. Ct. at 1233.  Therefore, the Court concluded that:

> We . . . hold that the Fifth Amendment, in its direct application to the
> Federal Government and in its bearing on the States by reason of the
> Fourteenth Amendment, forbids either comment by the prosecution on
> the accused's silence or instructions by the court that such silence is
> evidence of guilt.

Id. at 615, 85 S. Ct. at 1233.

Although Griffin involved statements made during the guilt phase of a

bifurcated criminal trial, the Supreme Court has recently confirmed that the Griffin

rule also applies to the sentencing phase of a trial.  The Court first suggested that

80

this would be the rule in its decision in <u>Estelle v. Smith</u>, 451 U.S. 454, 101 S. Ct.

1866 (1981), when it discussed whether violation of the Fifth Amendment <u>Miranda</u>

protections required exclusion of evidence during the sentencing stage of a trial.

The Court stated:

> The Court has held that the availability of the [Fifth Amendment] privilege does not turn upon the type of proceeding in which its protection is invoked, but upon the nature of the statement or admission and the exposure which it invites. In this case, the ultimate penalty of death was a potential consequence of what respondent told the examining psychiatrist. Just as the Fifth Amendment prevents a criminal defendant from being made "the deluded instrument of his own conviction," it protects him as well from being made the "deluded instrument" of his own execution.
>
> We can discern no basis to distinguish between the guilt and penalty phases of respondent's capital murder trial so far as the protection of the Fifth Amendment privilege is concerned. Given the gravity of the decision to be made at the penalty phase, the State is not relieved of the obligation to observe fundamental constitutional guarantees.

<u>Id.</u> at 462-63, 101 S. Ct. at 1873 (citations and quotations omitted).

Then, more recently, the Supreme Court directly held that <u>Griffin</u>'s

reasoning applies to sentencing, as well as liability, phases of a criminal

proceeding. <u>See</u> <u>Mitchell v. United States</u>, 526 U.S. 314, 119 S. Ct. 1307 (1999).

In <u>Mitchell</u>, the Court considered whether it was permissible for a district court to

draw a negative inference from a defendant's refusal to testify during a sentencing

hearing after the defendant had pled guilty to the offense. <u>Id.</u> at 327-30, 119 S. Ct.

81

at 1314-16.  The Court "decline[d] to adopt an exception [from the rule set out in

Griffin] for the sentencing phase of a criminal case with regard to factual

determinations respecting the circumstances and details of the crime."  Id. at 328,

119 S. Ct. at 1315.  The Court stated:

> The concerns which mandate the rule against negative inferences at a criminal trial apply with equal force at sentencing. Without question, the stakes are high: Here, the inference drawn by the District Court from petitioner's silence may have resulted in decades of added imprisonment. The Government often has a motive to demand a severe sentence, so the central purpose of the privilege – to protect a defendant from being the unwilling instrument of his or her own condemnation – remains of vital importance.

Id. at 329, 119 S. Ct at 1315.  See also  Tucker v. Francis, 723 F.2d 1504, 1509-13

(11th Cir. 1984) (noting in dicta that Griffin applies to sentencing phase).

We now turn to whether the prosecutor and trial court in this case ran afoul

of Griffin with respect to the evidence, argument, and instruction concerning

Isaacs' lack of remorse.  On several occasions, we have addressed the proper

application of Griffin, recognizing that the standards for evaluating a Griffin claim

as follows:

> The Fifth Amendment prohibits a prosecutor from commenting directly or indirectly on a defendant's failure to testify.  A prosecutor's statement violates the defendant's right to remain silent if either (1) the statement was manifestly intended to be a comment on the defendant's failure to testify; or (2) the statement was of such a character that a jury would naturally and necessarily take it to be a

82

comment on the failure of the accused to testify. The question is not whether the jury possibly or even probably would view the remark in this manner, but whether the jury <u>necessarily</u> would have done so. The defendant bears the burden of establishing the existence of one of the two criteria. The comment must be examined in context, in order to evaluate the prosecutor's motive and to discern the impact of the statement. Because the trial judge is the only person who has the opportunity to observe the prosecutor's demeanor firsthand, we review the district court's denial of the motion for mistrial for abuse of discretion.

United States v. Knowles, 66 F.3d 1146 (11th Cir. 1995) (citations, quotations, and footnotes omitted). See also United States v. LeQuire, 943 F.2d 1554, 1565 (11th Cir. 1991) (same); Solomon v. Kemp, 735 F.2d 395, 401 (11th Cir. 1984).

In applying Griffin, we have strictly enforced the requirement that a defendant show that the allegedly offensive comment was either manifestly intended to be a comment on the defendant's silence or that the comment naturally and necessarily related to the defendant's silence. For example, in Knowles, the Court considered whether a prosecutor violated Griffin when he pointed out problems with the defendant's defense, and then asked, "Did you ever hear an explanation for that?" 66 F.3d at 1162. The Court held that this statement did not necessarily relate to the defendant's silence, because the defendant could have presented other types of evidence to explain the inconsistency. Id. at 1163. Therefore, the Court concluded that:

As such, the remark is not so much a comment on Wright's failure to testify, but rather on Wright's <u>counsel's</u> failure to counter or explain the [damaging evidence]. It is not error to comment on the failure of the defense as opposed to the defendant, to counter or explain the evidence.

<u>Id.</u> at 1163 (citations and quotations omitted).

Likewise, in <u>Solomon v. Kemp</u>, the prosecutor addressed the fact that the State was not sure which one of two defendants possessed which of two guns found at a crime scene, and stated: "We don't know which defendant had which gun. The only person who can tell us that is [the defendant]." 735 F.2d at 401. We held that this statement was proper under <u>Griffin</u>, stating:

We find the statement to be rather an attempt to explain why the state could not match each defendant with one specific gun and to stress that this fact was not crucial to the state's case. Although the statement was an indirect reference to petitioner's silence, taken in context it is an objective evaluation of the state of the evidence. As such, it is permissible under <u>Griffin</u>.

<u>Id.</u>

In light of this precedent, we conclude that the Georgia Supreme Court did not act contrary to, nor did it unreasonably apply, Supreme Court precedent when it rejected Isaacs' claims related to the evidence, arguments, and instructions concerning his lack of remorse. It is true that some courts have found that remarks related to a defendant's lack of remorse may violate <u>Griffin</u>. <u>See</u> <u>Lesko v. Lehman</u>,

84

925 F.2d 1527 (3d Cir. 1991) (holding that prosecutor's comment on defendant's failure to express remorse violated Griffin); Hall v. State, 13 S.W.2d 115, 117 (2000) ("A comment that directly focuses the jury's attention on the defendant's personal feelings of remorse, which can only be supplied through the defendant's own testimony, necessarily indicates the defendant's failure to testify."); Dickinson v. State, 685 S.W.2d 320, 324-35 (Tx. Crim. App. 1984) (finding that argument concerning lack of remorse necessarily reflected on defendant's decision not to testify).

However, several other courts have found that, under many circumstances, arguments or comments related to a lack of remorse do not implicate the defendant's decision not to testify because they may relate to other evidence properly before the jury or to the defendant's demeanor at trial. See Williams v. Chrans, 945 F.2d 926, 953-54 (7th Cir. 1991) (finding that comments related to lack of remorse did not violate Griffin because jury could consider remorse in light of defendant's demeanor and testimony); Commonwealth v. Clark, 710 A.2d 31, 39-40 (Pa. 1998) (rejecting approach taken in Lesko and concluding that comments regarding lack of remorse were reference to defendant's demeanor at trial and character evidence); State v. Hamilton, 681 So.2d 1217, 1225 (La. 1996) (holding that arguments concerning lack of remorse did not necessarily implicate failure to

testify because other evidence of remorse could be presented); Odle v. Calderon, 919 F. Supp. 1367, 1397 (N.D. Cal. 1996) (same).

We believe that this is such a case in which the Georgia Supreme Court reasonably could conclude that the arguments and comments concerning Isaacs' lack of remorse did not implicate the right not to testify.  In particular, the most damaging evidence concerning Isaacs' lack of remorse came from his own words to that effect freely expressed to a reporter, Mark Piccard.  There is no suggestion that Piccard was a state actor when he interviewed Isaacs, or that Isaacs statements to Piccard were involuntary.  We see, and the Georgia Supreme Court found, no reason why that testimony was not permissible.  Therefore, we conclude that the Georgia Supreme Court acted reasonably in holding that the remorse evidence, arguments, and instruction did not violate Griffin, but instead were related to the evidence properly before the jury.  Because its holding was not contrary to, or unreasonable application of Griffin, further review is precluded by § 254(d)(1).

> E. Whether the District Court Erred in Holding that a Challenge to Electrocution as Cruel and Unusual Punishment was Procedurally Defaulted

Finally, Isaacs asserts that the district court erred by holding that his claim challenging the constitutionality of electrocution was procedurally barred.  In

Dawson v. State, 554 S.E.2d 137 (Ga. 2001), however, the Georgia Supreme Court recently held that electrocution was unconstitutional under the Georgia Constitution. The court went on to conclude that the provision permitting electrocution was severable from other death penalty provisions, so all Georgia death sentences could be carried out by lethal injection. In light of this case, Isaacs' cruel and unusual punishment claim is moot.

## IV. CONCLUSION

For the foregoing reasons, we conclude that AEDPA applies to Isaacs' petition; that the Georgia state courts did not act contrary to, or unreasonably apply, established federal law as determined by the U.S. Supreme Court in rejecting Isaacs' federal challenges to his conviction and sentence; and that the district court's denial of Isaacs' §2254 habeas petition was otherwise proper.

AFFIRMED.

EDMONDSON, Chief Judge, concurring in the judgment:

I agree that AEDPA applies. As I understand the law, deciding this case accurately is no complicated or laborious task. I easily accept that the pertinent decisions of the Supreme Court of Georgia were not contrary to and did not involve unreasonable applications of clearly established federal law.

BARKETT, Circuit Judge, specially concurring:

I concur in the judgment of the Court. While I believe that AEDPA should not be applied to Isaacs' petition, see Calderon v. U.S. District Ct. for the Central District of Cal., 163 F.3d 530 (9th Cir. 1998) (en banc), I conclude that precedent dictates that Isaacs is not entitled to relief on any of his claims, even under pre-AEDPA standards of review.